OPINION OF THE COURT
Chief Judge Cooke.
Of all the forms of behavior which may subject a person to *153 penal sanctions, one of the more difficult to prove beyond a reasonable doubt is that of larceny by false promise (Penal Law, § 155.05, subd 2, par [d]). In any prosecution grounded upon an alleged violation of this provision of the Penal Law, only rarely is there any direct evidence of the defendant’s intent in engaging in the conduct for which he must stand trial. Of necessity, then, criminal culpability must be inferred from facts and circumstances bearing on the ultimate issue presented to the jury. The sole question presented on this appeal is whether the People have satisfied their statutorily imposed burden of proving the defendant guilty of three counts of larceny in the third degree.
Defendant came to the Elmira area in 1975 in search of employment. Soon after he found a position with a local heating and plumbing concern, he was arrested and jailed on felony charges, for which he was subsequently acquitted. Nevertheless, when ultimately released on bail one month after arrest, defendant’s previous job was no longer available and the pending indictment together with his eighth grade education rendered the prospect of securing future employment dim. Borrowing on over 20 years’ experience in the construction trades, Churchill decided the only viable course left open to him was to secure contracting jobs on his own account. Although he had no experience running a business or, as this prosecution bears out, no conception of the responsibilities such an undertaking entails, defendant placed advertisements in the local newspaper as a home improvement contractor.
The initial response to these advertisements was less than overwhelming. Indeed, in three months Churchill entered into only two minor contracts with homeowners in the area. Those contracts were completed to the satisfaction of all concerned. Defendant’s troubles with law enforcement authorities began when four more substantial contracts came his way in, what was for a person in his station, a brief time.
In early March, 1976, Churchill was contacted by Ward Kahn. After some negotiation, the parties entered into a written contract whereby defendant was to enclose and finish Kahn’s back porch for $1,000. Defendant received a down payment of $775, which he assured Kahn was necessary to purchase building supplies and pay the labor necessary to complete the undertaking. After much prodding and some *154 thinly veiled threats, the work was eventually completed, albeit not to the complete satisfaction of the homeowner.
Three weeks later, defendant contracted with Hazel Hild to construct a concrete walkway and steps for her home in Elmira. Although defendant stated that he needed a $600 down payment to secure the necessary materials for the job, Hild paid him the full contract price, $800. That work was fully performed. Apparently satisfied with defendant’s workmanship, Mrs. Hild asked him to repave her driveway and that of her brother-in-law, who lived next door. Defendant asked for a down payment of $900 to be applied to the $1,200 contract price. Once again, Hild paid the full amount specified in the contract prior to performance. Defendant rented equipment with a portion of the proceeds of the down payment, had the two driveways graded, placed the footings and shored some of the excavation. No other services were rendered, but defendant did inform Mrs. Hild that he was encountering delay due to demands on his time in performing other contracts.
Less than two weeks after agreeing to repave the driveways for Mrs. Hild, defendant was contacted by Robert Van Horn. Van Horn wanted his attic converted into usable space, a new roof put on his house and drainage troughs installed. Defendant agreed to do the work for the sum of $3,400 and received a $2,400 down payment. The next day, defendant ordered approximately $1,300 in supplies for the contract, had them delivered to the job site, and a crew of four men commenced work. However, the work actually effected was sporadic at best and Van Horn’s numerous complaints to Churchill concerning both the amount and quality of the work performed did little to alleviate the problem. Completely, and no doubt justifiably, exasperated by the delays, Van Horn terminated defendant’s services.
Within a week of having arrived at an agreement with Mr. Van Horn, defendant entered into a contract with Doris Vicki in which he agreed to blacktop her driveway, install a sluice and pour a concrete floor in her garage for $2,600. Mrs. Vicki gave defendant a $2,100 down payment upon signing the contract. Once again, execution was something less than substantial: machinery was rented and delivered to the job site, the driveway graded, the garage floor formed and a ditch dug for the sluice pipe, which was delivered but never installed. Alarmed by a visit of the Chemung County Sheriff’s *155 Department investigating Churchill’s activities and dissatisfied with the lack of progress in completing the contracted-for work, Mrs. Vicki instituted an ultimately successful civil suit against defendant.
Spurred by complaints arising out of defendant’s business practices, the District Attorney launched an investigation into his activities. Soon thereafter, a four-count indictment was returned, charging defendant with grand larceny in the third degree in connection with his performance of the Kahn, Hild, Van Horn and Vicki contracts. At trial, the People proceeded on the theory that defendant was engaged in a scheme to defraud these four persons by entering into ostensibly legitimate business transactions which, in truth, he had no intention of completing. A jury found him guilty of larceny by false promise with respect to those counts in the indictment pertaining to the Hild, Van Horn and Vicki contracts. Sentences with a maximum of four years on each of these counts were imposed, to be served consecutively. Viewing as we must the evidence in a light most favorable to the People (People v Montanez, 41 NY2d 53, 57), we find that the proof in the record does not establish to a moral certainty that at the time defendant entered into the three contracts it was his intention not to perform.
At common law and indeed until the enactment of the present version of the Penal Law in 1965, a person could not be criminally prosecuted for obtaining property by means of a misrepresentation of future intention. Owing perhaps to the fact that it was a capital crime, the scope of early common-law larceny was rather circumscribed. It was confined to three limited situations: where the bailee of property broke bulk and misappropriated part of the bailment; situations in which the owner of the property was deemed to be in constructive possession of it and a person in a special relationship to the owner appropriates the property; and, where the owner of the property was induced to part with possession, but not title, due to some trick or artifice by the wrongdoer who subsequently misappropriates the property, i.e., larceny by trick (La Fave & Scott, Criminal Law, pp 618-622).
Larceny by false pretenses — where the wrongdoer induces the owner of property to part with title by means of a false representation of an external fact — was not a crime at common law and was first criminalized by statute in England in 1757 (30 George II, ch 24, § 1). Even after enactment of the *156 larceny by false pretenses statute, however, it was settled that the wrongdoer’s misrepresentation must relate to a past or present fact, not a statement of future intention (Regina v Dent [1955], 2 QB 590). Development of the crime of larceny in New York paralleled that of England. Thus, although the Legislature criminalized larceny by false pretenses in 1813 (see former Penal Law, § 1290 [L 1942, ch 732, § 2, as amd]), the viability of the sanction against certain forms of conduct remained the same. As in England, it was held that a misrepresentation of the wrongdoer’s state of mind or "an expression of intention not meant to be fulfilled” could not serve as the basis for a charge of larceny by false pretenses (People v Karp, 298 NY 213, 216; People v Blanchard, 90 NY 314, 324).
In time, it became evident the statutory definition of larceny accorded a measure of immunity for a form of swindle or fraud that was particularly egregious. No measure of punishment was available in cases where a person obtained property by means of a promise to perform in the future when the promisor had no such intention at the time of the making of such promise. Thus, if one induced another to sell him an article on credit by means of a false representation of his intention to pay for it, the State was without power to punish the promisor. This exculpation was justified primarily on the ground that defaulting debtors could often be subject to criminal prosecutions designed solely to compel payment and that it would be unduly harsh to premise a prosecution upon evidence only that a contract was not performed (see ALI Model Penal Code, TD No. 2, § 206.2, commentary, p 68). The prevailing opinion was that the obligee was aflbrded adequate protection by resort to civil remedies.
Nevertheless, it was patently incongruous that certain forms of larceny were punishable criminally, yet some of the most flagrant frauds perpetrated on the public could only be redressed in the civil forum (see Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 155.05, pp 114-115). To remedy this illogical distinction, with the enactment of the new Penal Law, the Legislature chose to criminalize larceny committed by means of false promise, taking steps at the same time to ensure that criminal sanctions not be imposed upon persons who do nothing more than simply breach a contract (see Third Interim Report, Temporary State Commission on Revision of the Penal Law and Criminal Code, Feb. 1, 1964, p 25).
*157 The elements of the crime of larceny by false promise are defined in section 155.05 of the Penal Law:
"1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.
"2. Larceny includes a wrongful taking, obtaining or withholding of another’s property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:
* * *
"(d) By false promise.
"A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct, or as the case may be, does not believe that the third person intends to engage in such conduct.
"In any prosecution for larceny based upon a false promise, the defendant’s intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed. Such a finding may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant’s intention or belief that the promise would not be performed”.
Absent direct proof, such as an admission by the accused or inculpatory testimony by an accomplice, in any prosecution grounded on larceny by false promise, the defendant’s intention must be ascertained by looking backward from the failure to perform and finding that at the time the accused made the promise he did not intend to carry out his end of the bargain. However, where the failure to perform is as consonant with ordinary commercial breach of contract as with criminal conduct, the danger of applying this statute becomes readily apparent. There is a very real danger that ordinary business transactions might be inhibited due to the risk of prosecuting one who is guilty of nothing more than a mere failure to pay his debts or an inability to perform contractual obligations. By *158 setting forth "a high standard of proof for establishment of the defendant’s intent” (People v Ryan, 41 NY2d 634, 639), the Legislature has recognized that the criminal justice system is not an alternative to every person who seeks retribution from a defaulting, judgment-proof adversary.
It is because of the danger of confusing larceny by false promise with purely civil wrongs that the Legislature has insisted that the People prove to a moral certainty that at the time of the promise the defendant had no intention that it would be performed. Where the inferences that may be drawn from the defendant’s conduct are ambiguous or are based on mere suspicion, the standard set forth in the statute has not been met (People v Ryan, supra; cf. People v Cleague, 22 NY2d 363, 367-368; Baird v Mayor, 96 NY 566). The inferences the People would have us draw in this case are sufficient only to create the impression that defendant was a bumbling novice in the entrepreneurial community — not that he engaged in a scheme to defraud those with whom he contracted.
The People rely on various factors in the record which they claim prove that defendant never had any intention of abiding by the terms of his compacts. Beyond the fact that three of the jobs were not completed, they note that defendant deposited the proceeds of the down payments in his personal checking account and used a portion of these funds for personal expenses. Yet, they point to no statute or understanding between the parties imposing a duty on defendant to reserve the down payments for certain purposes. Indeed, one would presume that a person with no other source of income would expend a portion of these funds to meet the day-to-day living expenses of himself and his family. Moreover, in spite of the precarious and disordered state of his finances, the record is devoid of any proof that defendant would require additional funds for the completion of the work remaining to be done on the contracts.
Stripped of all unseemly innuendos, the People have shown only that defendant had entered into three contracts for which he received substantial down payments and that he had failed to complete performance. The inferences to be drawn from this record certainly do not exclude to a moral certainty every hypothesis but that at the time he entered into the contracts defendant had no intention of meeting his obligations. Indeed, equally strong is the inference that defendant was simply an inexperienced, uneducated tyro whose talents *159 of salesmanship surpassed his ability to manage a business. In all three instances, supplies and equipment were purchased and delivered to the job sites and at least some work was commenced. Significant, too, is the fact that failure to complete performance was due, at least in part, to the actions of the homeowners themselves. Thus, Van Horn, dissatisfied with the progress of the work, terminated the contract; Vicki commenced a civil suit for breach of contract; and, Hild’s suspicions were aroused after law enforcement officers questioned her about defendant’s activities. On this record, it is impossible to conclude that the proof excludes to a moral certainty every hypothesis except guilty intent.
Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed.
Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur with Chief Judge Cooke.
Order reversed, etc.