*423 OPINION OF THE COURT
Chief Judge Cooke.
Defendant was convicted, after a jury trial in Suffolk County Court, of 13 counts of grand larceny in the second degree (Penal Law, § 155.35) and 2 counts of grand larceny in the third degree (Penal Law, § 155.30). Subsequently, he was convicted of 36 counts of grand larceny in the second degree and 4 counts of grand larceny in the third degree in a nonjury trial in County Court, Nassau County. In both cases, the Appellate Division modified the sentences imposed. The convictions were affirmed with the exception that in the Nassau County prosecution one count of second degree grand larceny was reduced to grand larceny in the third degree. Leave to appeal was granted by a Judge of this court in each matter.
On these appeals, defendant contends that the People failed to prove his guilt of the crime of larceny by false promise (Penal Law, § 155.05, subd 2, par [d]), beyond a reasonable doubt. Specifically, he maintains that the People’s proof failed to exclude to a moral certainty every hypothesis but that at the time defendant or his authorized agents induced people to invest money with him by promising them an inordinately high rate of return in a short period, he had no intention of fulfilling his promises. The orders of the Appellate Division should be affirmed. Viewed in a light most favorable to the People, the evidence at the trials established that at the time defendant made each and every promise, he knew as a certainty that each and every investor was in jeopardy, subject to the built-in danger that he would not be repaid, since defendant was engaged in a Ponzi scheme which could subject him to immediate prosecution and was bound at sometime in the future to collapse of its own weight. From inception, each promise was infected with that inevitability, not a mere possibility of collapse — an infection contrary to the promise and to that extent conceived in falsity. Promises, successively made, were certain to result in eventual unfulfillment. At the point when incoming investments would not be sufficient to meet the obligations owed to each investor, the promise could not be performed. Even when the threat of collapse was precipitated by the arrest of one of his agents in Nassau County, defendant nevertheless continued to take in new investments with the future intention that he would soon terminate the plan and flee.
At both trials, the testimony of all of the investors in defendant’s plan was essentially the same. Each of them *424 testified that he or she was induced to invest a minimum of $1,000 with Robert Luongo Associates (hereinafter referred to as Associates) for either a 1-, 3- or 12-week period. At the end of the period, the principal would become due together with interest in the amount of 10, 20 or 30 to 40% of the principal sum invested. Patrons of the plan were given sketchy details as to where their funds were invested. They Were informed, however, that none of the funds were being used to finance any illicit enterprises but rather were being invested in Associates and its affiliated enterprises. Associates, they were told, had interests in aircraft, racing cars, real estate, construction performance bonds, an insurance company, a restaurant, a consultihg firm, business promotion and a host of other concerns. As it later developed, however, these representations proved to be false or grossly exaggerated. Nevertheless, undoubtedly spurred by the allure of such enormous profits, investors eagerly placed their money with defendant with little investigation into the legitimacy of his operations,
The true manner in which defendant obtained possession of the money and the uses to which those funds ware applied was revealed through the testimony of his agents, as well as the statements and actions of the defendant himself. Joseph Merlo, defendant’s chief associate and supervisor of his sales force, testified that when he met the defendant in late 1971 he was immediately impressed with his aura of prosperity. Offered a position as a solicitor of investor funds, Merlo was informed that although Associates and its subsidiaries stood behind the investments, the key to the continued success of the scheme was the constant accretion of new investment funds into the plan. Merlo initially attracted a number of new investors, trading on the appearance of prosperity surrounding Associates and the defendant together with the promise of a large rate of return on a short-term investment.
The mechanics of investment in the plan were essentially constant. In return for their money, depositors were given a promissory note signed by the defendant specifying the date payment was due and the gross amount to be paid. Merlo would collect the money for the new investments on Thursday and bring it to defendant. The following day, defendant would give Merlo the funds needed to distribute to clients withdrawing funds from the program. Merlo was told by defendant that he drove to Philadelphia to invest the money on Thursday evenings where he picked up the funds necessary for distribu *425 tion the following day. However, aside from his statements, there was no evidence that these trips were made. Thus, in the initial stages of the plan, those investors who wished to withdraw their investments were promptly paid. The effect of such prompt payment, of course, was to convert every investor into a missionary spreading the word of the enormous profits which could be speedily attained with no discernible risk of loss.
Accordingly, over a two-year period, the project expanded with amazing rapidity. In keeping with the production-oriented nature of the plan, new agents were enlisted to collect and distribute investor funds. Defendant instructed the agents to inform investors that for a 12-week investment, 30% interest would be returned by Associates. The agents were told to inform investors that Associates would invest their money in short-term real estate and performance bonds as well as various real or imagined subsidiaries. The agents were to give depositors a promissory note, now in the name of Associates, incorporating the essential terms of the transaction. As the notes matured, the agents were instructed to try and persuade depositors to reinvest but, if they chose not to do so, disbursements on the matured notes were to be paid from the proceeds of incoming investments. Each week, either defendant, Merlo, or Ciro Campos, another key aide, would pick up the excess funds taken in or give the agent enough money to cover the difference.
The plan operated to the apparent satisfaction of all concerned until February 11, 1974 when the Nassau County Police, armed with a warrant, arrested Leonard Shefts, an agent of defendant, searched his home and seized records relating to the operation of the plan. Visibly upset, defendant told Merlo to destroy any records relating to the scheme in his possession and to instruct the other agents to do the same. The following morning, defendant fled to Campos’ home in New Jersey after first burning his own records. At a meeting with Campos and Merlo in that State, defendant informed them that if all depositors who had invested with Shefts were paid when their notes became due, their problems with the law would be obviated. To accomplish this objective, over $90,000 would have to be raised by March 1, 1974. Merlo and Campos were told that all notes coming due during the ensuing 12 weeks would be paid after which the program would be closed.
*426 There then ensued what can best be described as a mad scramble to secure the funds necessary to pay Shefts’ investors. During that period, defendant assured his agents that all investors would be paid and to continue to take in new funds. On February 28, 1974, defendant, Campos and Merlo met at Campos’ home in New Jersey to arrange for the payment of Shefts’ investors. After showing Merlo an article about the life of Charles Ponzi, a notorious swindler, defendant remarked: "If this thing collapses, it will be known as a Luongo scheme and not a Ponzi scheme.”
Shefts’ investors were paid on March 1, 1974. However, the other agents were instructed to "hold off’ their investors whose notes were due on that date. Defendant told Campos and Merlo that payment would be a few days late and arranged to meet them on March 5. On that date, while Merlo and Campos were waiting for defendant who was to give them the funds to distribute to their agents and investors, defendant was somewhere over the Atlantic on his way to Sweden.
After his arrest by Interpol on June 29, 1974, defendant was returned to the United States that October in the custody of detectives from Nassau and Suffolk Counties. On the flight back, he remarked that he was familiar with the life of Charles Ponzi and that when he first started his plan he realized it would grow, but "he never dreamed it would ever catch on and grow like wildfire the way it did”. Luongo also stated that although approximately $12 million flowed into the plan during its short life, if it were allowed to continue for one more year he would have been able to turn Associates and its subsidiaries into profit-making enterprises.
Subsequent investigation revealed that many of defendant’s representations concerning his corporate holdings and investments were at least misleading, and oftentimes simply false. For instance, most of the subsidiaries of Associates were simply shells, having no assets and doing no business. Each of the corporations that were in operation were doing so at a loss and were subsidized by investor funds. A number of the concerns had already gone out of business at the time defendant represented them as viable entities; others never existed at all. Associates, the jewel of defendant’s empire, had never turned a profit and was used as a vehicle through which investor’s money flowed to its subsidiaries. In short, none of defendant’s putatively legitimate enterprises could have re *427 turned any funds to investors; in fact, those that did exist were draining investor money simply to stay in business.
As noted, both prosecutions proceeded under the theory that defendant’s conduct constituted the crime of larceny by false promise (Penal Law, § 155.05, subd 2, par [d]).* Unknown to the common law, the crime of larceny by false promise is committed when a person "pursuant to a scheme to defraud * * * obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct * * * when he does not intend to engage in such conduct”. The People maintain that to induce his victims to part with their money, defendant falsely promised to invest their funds in certain specified enterprises so as to generate a 30 to 40% return in a 12-week period. There is no real dispute as to whether these promises were made. The People’s cases rested on the proposition that these promises were materially false for, in reality, defendant was engaged in a Ponzi scheme, whereby he took the investments from a subsequent group of individuals and used a portion of those funds to meet his obligations to earlier investors, retaining the difference. As more investors were enticed by the allure of huge profits, it was necessary to enlist more people into the plan to meet the obligations owed to prior investors. Ever rising in a pyramid-like fashion, the scheme served as an illustration of the stark realities of Malthusian economics and, as it was predestined to do, eventually collapsed of its own weight (see People v Consolazio, 40 NY2d 446).
A conviction of the crime of larceny by false promise cannot rest on mere probabilities; indeed, the standard of proof the People must satisfy is more burdensome than that of most crimes. Because the failure to perform a promise may ordinarily be redressed in the civil forum, the statute set forth "a high standard of proof for establishment of the defendant’s intent” (People v Ryan, 41 NY2d 634, 639; see, also, People v Churchill, 47 NY2d 151 [history and development of larceny by false promise]). Accordingly, the mere fact that the defen *428 dant’s promise was not performed, standing alone, is insufficient to sustain a conviction of larceny by false promise. A finding that the defendant obtained property by means of a promise to perform in the future when he had no intention of doing so at the time the promise was made "may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant’s intention or belief that the promise would not be performed” (Penal Law, § 155.05, subd 2, par [d]).
Only rarely is there any direct proof as to the intent of a defendant at the time the promise was made. Of necessity, criminal intent must be inferred from the actions of a defendant after the promise was made, the nature of the promise and relevant circumstances surrounding it, and the actions of the defendant after his failure to perform (see People v Churchill, supra, at p 158; cf. People v Bollettieri, 9 NY2d 629, cert den 366 US 950). In making this inquiry, however, great care must be exercised by the trier of fact so as to ensure that mere suspicion is not elevated into a finding of larcenous intent (People v Ryan, 41 NY2d 634, 640, supra). Instead, a finding of larcenous intent may be made only where that determination flows naturally and reasonably from the facts in evidence and must exclude to a moral certainty any implication that the defendant has committed a mere civil wrong.
That burden has been met here. The evidence discloses the existence of many circumstances beyond the mere failure of this defendant to perform his promise by his failure to pay his investors. The conclusion that defendant was engaged in a fraudulent Ponzi scheme is inescapable. Defendant represented to his associates, agents and investors that the funds placed with him would be invested in various enterprises whose business would be sufficient to generate an extraordinarily large profit within a brief period of time. As noted, some of these concerns were never owned by defendant or Associates and all of those in which there was an interest had never turned a profit. Indeed, the continued viability of these enterprises was being subsidized by investor funds. Rather than representing simple bad investments, as defendant maintains, these businesses existed in name only, enabling defendant to refer to and project them as viable enterprises to ensnare his victims.
*429 Indeed, the very size of the promised return on investment funds is indicative of larcenous intent. The investment program was not represented as a speculative venture. Instead, investors were guaranteed at the time they gave defendant their money that a large profit would be available to them in a matter of weeks. Typically, investors were promised a 30 to 40% return in 12 weeks. To constitute a viable investment program, the profits from the funds invested by defendant must have been sufficient to return the profits guaranteed to investors, pay out 10% of the principal sum invested to agents as well as cover the losses sustained by Associates and its subsidiaries. Even given the dubious assumption that defendant did not personally profit in his capacity as the moving force behind the plan, the annual yield on the funds invested would have had to have been in excess of 200% simply to meet expenses. Expert testimony, if credited by the trier of fact, established that there were no legitimate investments which would be able to guarantee a return of such magnitude.
Thus, there is simply no other conclusion but that defendant was using funds invested by subsequent investors to meet his prior obligations (see People v Consolazio, 40 NY2d 446, supra; cf. People v Miller, 169 NY 339). Investors who wished to withdraw funds from the plan were paid from funds supplied by incoming investors. Hence, defendant’s ability to fulfill his promises Was premised solely on the illegal continuation and expansion of receiving increased investment funds, which continuation was in jeopardy from the inception. The finding that defendant was conducting a fraudulent Ponzi scheme rather than a legitimate investment program is further bolstered by his boast to Merlo that if his conduct became known, the Ponzi scheme would thereafter be known as the Luongo scheme.
Further evidence of defendant’s fraudulent intent may be inferred from his actions after the arrest of Shefts, one of his Nassau County agents. When the scheme began to fall apart, defendant fled to Campos’ home in New Jersey, stating that he did not want to be bothered by the District Attorney. He destroyed his records relating to the plan and instructed his agents to do likewise. Defendant hoped that by raising the funds necessary to pay back Shefts’ investors he would be able to stave oif any larceny charges. When that strategy appeared doomed to failure, he fled the country. These activities evince defendant’s consciousness of guilt and are relevant to the *430 question of his criminal intent (see People v Leyra, 1 NY2d 199, 208-209). And, of course, defendant’s voluntary statements after his arrest in Sweden destroy any claim that he was merely an overly optimistic investment advisor whose fortunes plunged due to an unexpected downturn in the market.
It is true that defendant’s operations assumed some of the forms of a legitimate business venture. Nevertheless, beneath it all the manner in which he obtained possession of the money of his victims was by means of false promise. No other conclusion can be drawn from the record but that defendant plainly intended from the inception, and at every stage of his operation, to obtain the money of others by means of fraudulent devices and then appropriate that money to his own use. In sum, the evidence in these cases is wholly consistent with guilty intent and excludes to a moral certainty every hypothesis except that defendánt intended to perform (cf. People v Rolchigo, 33 AD2d 1060, 1061, affd 28 NY2d 644).
As an additional ground for reversal, defendant maintains that principles of both statutory and constitutional double jeopardy precluded his trial in Nassau County in connection with charges arising out of the same plan which was the predicate for his prior Suffolk County convictions. The flaw in these arguments lies in the fact that each larceny was an independent criminal transaction which can be prosecuted independently (CPL 40.10, subd 1; 40.20, subd 2, par [e]; People v Rossi, 5 NY2d 396, 400-401; People v Cox, 286 NY 137). Inasmuch as none of the victims named in the Suffolk County indictment were subjects of the subsequent Nassau County prosecution, there was no bar to the second trial.
We have examined defendant’s remaining contentions and find them to be without merit.
Accordingly, in each appeal, the order of the Appellate Division should be affirmed.
Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur with Chief Judge Cooke.
In each case: Order affirmed.

 In the Nassau County prosecution, it was also found that defendant’s acts were sufficient to support his conviction of the crime of larceny by false pretenses (Penal Law, § 155.05, subd 2, par [a]; see People v Karp, 298 NY 213). In view of our conclusion that both convictions are fully sustainable on larceny by false promise grounds, it is unnecessary for us to comment upon the applicability of this theory of larceny to defendant’s actions.