T.C. Memo. 2018-180

UNITED STATES TAX COURT

MICHAEL A. GIUNTA AND JULIA A. GIUNTA, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9249-17.                          Filed October 29, 2018.

<u>Richard Stephen Kestenbaum</u> and <u>Scott L. Kestenbaum</u>, for petitioners.

<u>Marc L. Caine</u> and <u>Peggy Gartenbaum</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioners' Federal income tax for 2013,
the Internal Revenue Service (IRS or respondent) determined a deficiency of
$604,267 and an accuracy-related penalty of $120,854.  The issues for decision are
whether respondent (1) properly disallowed a $2,998,850 loss deduction allegedly
attributable to an "overseas investment" that petitioners contend became worthless

[*2] during 2013 or (alternatively) gave rise to a theft loss deduction and (2) properly determined a substantial understatement penalty under section 6662(a) and (b)(2).[1]  We resolve both issues in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of facts and the attached exhibits are incorporated by this reference.  Petitioners, who are husband and wife, resided in New York when they filed their petition.

Michael Giunta (petitioner) received a bachelor's degree in marketing and spent most of his career with the McDonald's Corp.  He purchased his first McDonald's franchise in 1989 and by 2013 owned five McDonald's restaurants in the New York metropolitan area.  Each restaurant was held by a separate S corporation, one of which was named Mijul, Inc. (Mijul).  Another of petitioner's wholly owned S corporations, QSC Management, Inc. (QSC), acted as a management company for the restaurants, consolidating check writing, payroll, and other functions.

Petitioner began selling his restaurants in 2013, realizing gain of $3,541,479 for that year alone.  On their Form 1040, U.S. Individual Income Tax Return, for

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the year in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** 2013, petitioners offset against this gain a purported loss of $2,998,850 attributable to an asset described as an "overseas investment." On Form 8949, Sales and Other Dispositions of Capital Assets, petitioners reported that they had acquired this "overseas investment" on October 1, 2007, and had disposed of it on December 31, 2013, for consideration of zero.

The story begins in 2004 when petitioner's neighbor, John Kristie, allegedly pitched an investment concept to him. Petitioner testified that he had no idea what this investment involved, but he believed it had something to do with "mid-term notes." According to petitioner, interest rates were rather low at the time, and he thought this investment would provide an "opportunity for us to basically leverage * * * bank funds."

Petitioner submitted into evidence some promotional materials, including part of a document captioned "Term Sheet Concepts," which he purportedly reviewed before investing. According to the Term Sheet Concepts, Mr. Kristie and an associate would fly to London and secure a $132 million loan, using the investors' $3.5 million startup money to establish their creditworthiness. They would then use that loan to secure a "bank guarantee" with a "face value of $165,000,000 and a maturity date of 10 years after * * * issuance." Nine days after securing the initial loan, the "bank guarantee" would somehow be used to

[*4] repay the startup money with a hefty return to the investors who had supplied those funds. An attached "joint venture agreement" was accompanied by a nondisclosure agreement resembling the sort often used by tax shelter promoters. The investment as described in the Term Sheet Concepts set forth no coherent business or investment strategy.

Despite his decades of business experience, petitioner did not seek advice about this investment from his long-time accountant, Mark Perlson, C.P.A., who was also a wealth manager. Nor did petitioner seek advice from anyone else. He testified that he was persuaded to invest because Mr. Kristie had a good reputation and was a member of his church.

Despite having little understanding of the investment, petitioner testified that he agreed to invest $2.5 million. He submitted into evidence a copy of a purported "Investment Agreement" dated October 30, 2004. By investing $2.5 million, petitioner would supposedly get a 50% interest in a New York limited liability company named BPG-LBK (BPG). The investment agreement says that petitioner was to send $2.5 million to an escrow account at a law firm named Honig, Mongoi, Monahan, and Sklavos (HMMS).

Apart from petitioner's testimony, which we did not find credible, there is no evidence that he ever made the supposed $2.5 million investment. He testified

**[\*5]** that the source of funds for the investment was a $2.5 million loan that his restaurants secured from GE Capital. The restaurants do appear to have secured such a loan, and the loan proceeds were allocated among them as shown in their QuickBooks entries. But there is no evidence that the S corporations disbursed any of these funds to HMMS or to petitioner for transmission to HMMS. And there is no evidence, in the form of bank statements, wire transfer cover sheets, receipts from HMMS, or any other document, to show that petitioner transferred $2.5 million (or any smaller sum) to HMMS in October 2004. Petitioner did not call anyone from HMMS to testify.

Five months later, on February 18, 2005, Mijul received a wire transfer of $1.9 million from the HMMS escrow account. There is nothing on the wire transfer cover sheet to indicate what this payment covered or why it was being made. The wire transfer cover sheet contains no "re" line and makes no reference to any sort of investment. Petitioner testified that this $1.9 million transfer represented a payout on his $2.5 million "overseas investment." We did not find this testimony credible.

Petitioner testified that he subsequently contributed another $542,500 to his "overseas investment." He submitted into evidence documents showing:

**[\*6]** (1) a $300,000 wire transfer in April 2005 from Mijul to the HMMS escrow account, (2) a $75,000 wire transfer in June 2005 from Mijul to BPG, and (3) a $32,500 cashier's check dated February 23, 2007, from petitioner's personal account to Mr. Kristie.

Petitioner also submitted a "Transaction Journal" for QSC and invited the Court's attention to three QuickBooks entries recorded in it. The first entry, from November 2007, shows a transfer of $100,000 to Susan Kristie, John Kristie's wife. The other two entries, dated May 2008 and November 2010, show wire transfers to Mr. Kristie for $25,000 and $10,000, respectively. The memo lines next to the first two of these entries indicate that these transfers were made "per Mike," which the Court understands to mean under instructions from petitioner. Petitioner testified that these entries reflected additional investments that he made in BPG.

At a time not disclosed by the record, Mr. Kristie allegedly created another investment vehicle, Optimus Partners Trust, LLC (OPT). The documents describing OPT do not disclose any coherent business or investment strategy. Petitioner allegedly invested in OPT although he produced no evidence to establish the fact or amount of his investment. He also mentioned OPT to friends from his church, and five of them allegedly chose to invest large sums.

**[\*7]**   Two of petitioner's friends, Messrs. Raciborksi and Vigliotta, testified at trial.  Mr. Vigliotta testified to making a $200,000 investment in OPT; Mr. Raciborski testified to making an $800,000 investment at a time when his total net worth was only $850,000.  Neither supplied any evidence to establish the fact or amount of his investment.  Each allegedly received a membership interest in OPT, supposedly memorialized in a "joint venture agreement."  But this agreement, if genuine, was obviously unfinished:  It stated that each investor had an ownership interest of "X%."

Petitioner testified that OPT never made any distributions.  As a result, his friends allegedly became worried about their investments and asked petitioner to bail them out.  He allegedly complied, directing QSC to make 40 separate wire transfers, ranging from $5,000 to $180,000, to his five friends between June 2006 and July 2014.  The total amount thus transferred was $2,028,350.  There is no documentary evidence to establish why any of these payments were made.

During the examination of petitioners' 2013 return, petitioner submitted to the IRS substantially identical signed statements by Messrs. Vigliotta and Raciborski.  Each statement was dated August 25, 2015, and each asserted that petitioner had wired money to each of them "as a reimbursement of * * * [their] investment in BPG."  At trial each witness was asked why this statement referred

[*8] to an investment in BPG when each had allegedly invested in OPT. Neither had a plausible response, and we did not find the testimony of either witness credible.

By making these payments to his friends, petitioner testified that he gradually "bought out" their interests in OPT. But he presented no documentary evidence to establish that he ever had an ownership interest in OPT to start with. And he presented no documentary evidence to establish that he acquired additional ownership interests in OPT by virtue of the 40 wire transfers he made to his friends. Petitioner's friends did not execute any document transferring ownership of their alleged OPT interests to him. And no one informed the principals of OPT (if it actually existed) that any change in share ownership had occurred.

Although petitioner was supposed to receive monthly and annual payouts from BPG, he testified that he received no payment of any kind after February 2005. And although he allegedly began bailing his friends out of their failing investments in 2006, he asserted that he did not realize that his own investment had become worthless until 2013. He drew this inference not from any significant discovery or event but, as his accountant explained, from the fact that his "correspondence with Mr. Kristie was less regular and they weren't as upbeat." Petitioner testified that Mr. Kristie, beginning in October 2013, had become angrier and

**[*9]** more irrational in their exchanges. The record includes several inconclusive emails from late 2013 from which petitioner allegedly inferred that his investments in BPG and OPT had lost all value.

Petitioner took no action of any kind in an effort to recover on his alleged $3 million investment. He knew the identity of several key players in this scheme, including Mr. Kristie, HMMS, and two individuals: Sandip (in London) and Surin (in New York). Petitioner took no legal action against any of these individuals or entities and did not (as far as the record reveals) even investigate the possibility of doing so. And despite his professed belief that his investment had become worthless, he continued to direct payments to friends who had allegedly invested in OPT. QSC wired $119,500 to Mr. Vigliotta in November 2013 and $45,000 to Mr. Raciborski in July 2014, allegedly to buy out their OPT interests.

On their Federal income tax return for 2013 petitioners reported a long-term capital gain of $3,541,479 from the sale of the McDonald's restaurants. Against this gain they offset a long-term capital loss of $2,998,850. On the Form 8949, their accountant listed "overseas investment" in the box captioned "description of property," stated that petitioners had acquired this investment on October 1, 2007, stated that their "cost or other basis" was $2,998,850, and stated that the proceeds of sale were zero.

[*10] Neither petitioner nor Mr. Perlson, his accountant, offered a plausible explanation as to how the claimed cost basis of $2,998,850 was calculated or why October 1, 2007, was listed as the "acquisition date." Mr. Perlson stated that he had chosen that date arbitrarily to indicate that the loss "was long term." He stated that he came up with the term "overseas investment" and listed December 31, 2013, as the date of disposition on the basis of a conversation with petitioner.

The IRS selected petitioners' 2013 return for examination. During the examination petitioners submitted a spreadsheet showing a basis calculation of $3,170,850 for the alleged investment. This sum was calculated as follows:

| | |
|---|---|
| Alleged original investment | $2,500,000 |
| Less 02/05 payout | (1,900,000) |
| Alleged buyout of friends' interests in OPT | 2,028,350 |
| 04/05 wire from Mijul to HMMS | 300,000 |
| 06/05 wire from Mijul to BPG | 75,000 |
| Checks/wires from QSC to Mr. Kristie/Mrs. Kristie | 167,500 |
| Total | 3,170,850 |

The IRS examination team concluded that petitioner had not substantiated that he had made an investment, what his basis in that alleged investment was, or that the investment had become worthless during 2013. On November 7, 2016, IRS Officer Marianne Brennan completed Form 300, Civil Penalty Approval

**[\*11]** Form, recommending the imposition of a penalty under section 6662(d) for an underpayment attributable to a substantial understatement of income tax. Her supervisor approved this recommendation on November 21, 2016. On February 1, 2017, the IRS mailed petitioners a notice of deficiency determining the tax deficiency and penalty set forth supra p. 1. Petitioners timely petitioned this Court for redetermination.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners do not contend (and could not plausibly contend) that they have satisfied the requirements of section 7491 for shifting the burden of proof. See Rule 142(a). Accordingly, the burden of proof for all factual issues remains with them.

On their 2013 return petitioners reported a capital loss from the disposition of a single "overseas investment." At trial petitioner testified that this loss was actually attributable to investments in two separate entities: BPG and OPT. Petitioners contend that this loss was deductible under section 165(a) and (g) as a loss from "worthless securities." Alternatively, they contend that it was deductible under section 165(a) and (c)(3) as a "theft loss." We find no merit in either theory.

**[*12]** A.  Worthless Securities Loss

Section 165(g)(1) provides that, "[i]f any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall * * * be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset."  For purposes of section 165(g), the term "security" means "a share of stock in a corporation," the "right to subscribe for, or to receive, a share of stock in a corporation," or a bond or other evidence of indebtedness issued by a corporation or governmental entity.  See sec. 165(g)(2).

To be entitled to deduct a loss under section 165(g) a taxpayer must carry his burden of proving three distinct facts.  See Rule 142(a).  First, he must establish that he owned a "security" as defined by section 165(g)(2).  Second, he must establish his "adjusted basis" in that security.  See sec. 165(b); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 220 (1998) (determining that taxpayer had no basis in stock when he introduced no credible evidence to establish basis).  Third, the taxpayer must establish that the security "bec[ame] worthless during the taxable year" for which the deduction is claimed.  Sec. 165(g)(1).  "Worthlessness is a factual question and petitioner has the burden of proof to overcome respondent's determination" that the stock did not become worthless during the year in question.  Austin Co. v. Commissioner, 71 T.C. 955, 969 (1979).

**[\*13]** We find that petitioner has substantiated none of these facts. First, he has not shown that he owned a "security" within the meaning of section 165(g)(2). He does not contend that his overseas investment took the form of a bond or other evidence of indebtedness. See sec. 165(g)(2)(C). And he has not established that PMG or OPT actually existed, that either was a corporation, or that he made an investment that took the form of "share[s] of stock in a corporation." See sec. 165(g)(2)(A).

Second, petitioner has not established his basis (if any) in his investment. There is no credible evidence, documentary or otherwise, to show that petitioner made, in October 2004, an initial investment of $2.5 million in BPG. It appears that petitioner or his S corporations wired a total of $467,500 to the HMMS escrow account, Mr. Kristie, and/or Mrs. Kristie at various times between April 2005 and November 2010. But there is no credible evidence to show that these payments were made to acquire shares of corporate stock. The $75,000 wire transfer that Mijul directed to BPG in June 2005, see supra p. 6, may come closer to establishing basis. But there is no credible evidence that this payment was made to acquire corporate stock as opposed to being (for example) a transfer to BPG as Mr. Kristie's nominee. In no case did BPG furnish petitioner with an

[*14] acknowledgment that it had received funds from him for investment or that his ownership interest in BPG had changed.

Nor has petitioner established his basis by virtue of the 40 payments totaling $2,028,350 that he or his S corporations made to his five friends (three of whom did not testify). These payments were made over eight years in amounts ranging from $5,000 to $180,000. There is no evidence that petitioner acquired stock in OPT by making these payments.

To begin with, there is no credible evidence that any of petitioner's friends actually made any investment in OPT at the outset. Assuming arguendo that they made investments, they executed no document(s) transferring any portion of their ownership interest(s) to petitioner. And there is no evidence that petitioner or his friends notified the principals of OPT (assuming it existed) that any change in share ownership had occurred.

The record is devoid of reliable evidence as to why petitioner made these transfers. Some of the transfers may have been gifts to Mr. Kristie, Mrs. Kristie, or his friends, or the transfers may have been connected with other business endeavors in which they were jointly engaged. But there is simply no credible evidence that the payments were made to acquire shares of corporate stock.

**[\*15]** Third, petitioner has not carried his burden of proving that his alleged BPG or OPT investments became worthless during 2013. To establish worthlessness in a particular year the taxpayer must generally point to a "fixed and identifiable event" that caused the security to lose all value. Dittmar v. Commissioner, 23 T.C. 789, 798 (1955) (quoting 875 Park Ave. Co. v. Commissioner, 217 F.2d 699, 701 (2d Cir. 1954), aff'g a Memorandum Opinion of this Court). Such an event may include a corporate dissolution or similar occurrence that "clearly evidences destruction of both the potential and liquidating values of the stock." Austin Co., 71 T.C. at 970. To establish that he has abandoned a security, the taxpayer "must permanently surrender and relinquish all rights in the security and receive no consideration in exchange." Sec. 1.165-5(i)(1), Income Tax Regs. This determination is made on the basis of "all the facts and circumstances." Ibid.

Assuming arguendo that petitioner made an investment in BPG or OPT, he has pointed to no identifiable event evidencing that his investment became worthless during 2013. See Austin Co., 71 T.C. at 970. He allegedly based his inference to that effect on the pessimistic tone of his communications with Mr. Kristie and on yearend email exchanges with the supposed investment managers. But these emails do not refer to any investment that petitioner had made in BPG or OPT.

**[*16]** In any event the most one can deduce from these emails is that an anticipated payout of some kind was not going to occur. Petitioner had been expecting, but had not received, monthly payouts on his alleged BPG investment since February 2005, i.e., during the preceding 106 months. He provided at trial no reason to believe that his alleged investment had become worthless during 2013 rather than during one of the previous seven years. On the other hand he continued to make supposed investments: QSC wired $119,500 to Mr. Vigliotta in November 2013 and $45,000 to Mr. Raciborski in July 2014, allegedly to buy out their OPT interests. These transfers sit uncomfortably with petitioner's assertion that he viewed his investment as worthless in late 2013.

By the end of the trial the circumstances surrounding petitioner's alleged "overseas investment" were as mysterious as they had appeared on his 2013 tax return. But assuming arguendo that he had made some sort of investment, he did not carry his burden of proving that he had purchased a "security" as defined in section 165(g)(2), what his basis was in that security, or that the security had become worthless during 2013. We find that petitioner claimed a fictitious loss deduction of $2,998,850 for 2013 because he wished to offset the $3,541,479 gain that he was required to report upon his sale of the McDonald's restaurants.

**[*17]** B.     Theft Loss

Petitioner alternatively contends that his purported investments gave rise to a theft loss. In the case of an individual the Code allows a deduction for losses, not compensated by insurance or otherwise, that "arise from fire, storm, ship-wreck, or other casualty, or from theft." Sec. 165(a), (c)(3). "[A]ny loss arising from theft shall be treated as sustained during the taxable year in which the tax-payer discovers such loss." Sec. 165(e). A "theft" includes a loss of property caused "by swindling, false pretenses, and any other form of guile." Bellis v. Commissioner, 61 T.C. 354, 357 (1973) (quoting Nichols v. Commissioner, 43 T.C. 842, 884 (1965)), aff'd, 540 F.2d 448 (9th Cir. 1976); see sec. 1.165-8(d), Income Tax Regs.

To deduct a theft loss, the taxpayer must establish: (1) the occurrence of a theft under the law of the relevant jurisdiction, (2) the amount of the loss, and (3) the year in which he discovered the loss. See, e.g., Gerstell v. Commissioner, 46 T.C. 161, 175 (1966); Monteleone v. Commissioner, 34 T.C. 688, 692 (1960); McKinley v. Commissioner, 34 T.C. 59, 63 (1960); Mowry v. Commissioner, T.C. Memo. 2018-105, at *20-*21. For the reasons set forth above in connection with the worthless securities loss, we conclude that petitioners have not established the

**[*18]** fact or the amount of the loss or that 2013 was the year in which they discovered the loss.

Nor have petitioners proven that a theft occurred under the law of the relevant jurisdiction.[2] They contend that, under New York law, Mr. Kristie perpetrated a theft by false pretenses when he encouraged petitioner to invest in an apparent Ponzi scheme. See N.Y. Penal Law sec. 155.05 (McKinney 2018); People v. Luongo, 391 N.E.2d 1341, 1345-46 (N.Y. 1979) (finding that a promoter of a Ponzi scheme was guilty of larceny by false promise). But petitioner's "overseas investment" had an alleged nexus with England as well as New York. He has not shown that the wrongdoing that caused his alleged loss was perpetrated by Mr. Kristie or by the London investment managers, or that the "theft" inquiry would be governed by New York or U.K. law.

In any event petitioners have not established any facts of the sort normally adduced to demonstrate a theft. The record contains only speculative testimony by petitioner, which is insufficient to establish that a theft occurred. See Seaver v. Commissioner, T.C. Memo. 2009-270, 98 T.C.M. (CCH) 493, 495 (denying a theft

---

[2]Though a taxpayer need not demonstrate a criminal conviction, see Monteleone v. Commissioner, 34 T.C. 688, 694 (1960), he must prove by a preponderance of the evidence that an actual theft occurred, see, e.g., Enis v. Commissioner, T.C. Memo. 2017-222, at *18 (citing Allen v. Commissioner, 16 T.C. 163, 166, (1951)).

[*19] loss deduction where the taxpayers "provided only uncorroborated testimony"); Frankel v. Commissioner, T.C. Memo. 1988-1, 54 T.C.M. (CCH) 1442, 1445-1446 (denying a theft loss deduction where the taxpayer could only speculate about which of two persons might have committed the purported theft). For all these reasons, we find that petitioners are not entitled to any theft loss deduction for 2013.

C.    Penalties

The Code imposes a 20% penalty upon the portion of any underpayment of tax attributable to (among other things) "[a]ny substantial understatement of income tax." Sec. 6662(a), (b)(2). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. See sec. 6662(d)(1)(A). The understatement of tax that respondent determined for 2013, and that we have sustained, is $604,267. That amount comfortably exceeds $5,000 and 10% of the tax (roughly $760,000) required to be shown on petitioners' return.

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of any individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has satisfied his burden of production by showing that petitioners' understatement of tax for 2013 exceeds 10%

[*20] of the tax required to be shown on their return. Respondent also bears the burden of showing that the penalty was "personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b); see Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42. The record includes a copy of the Civil Penalty Approval Form signed by the immediate supervisor of the revenue agent who examined petitioners' returns, approving imposition of a section 6662 substantial understatement penalty. Respondent has thus satisfied his burden of production.

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and that he acted in good faith with respect to, the underpayment. "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. If a taxpayer alleges reliance on the advice of a tax professional, he must show that his adviser was competent and that he supplied that person with all "necessary and accurate information." See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also sec. 1.6664-4(b)(1), (c), Income Tax Regs.

[*21]  Petitioners contend they relied in good faith on Mr. Perlson, their account-ant, who they claim is a qualified tax professional.  In preparing the Form 8949 on which the $2,998,850 loss deduction was claimed, Mr. Perlson relied entirely on oral representations by petitioner.  By his own admission Mr. Perlson did not know what the alleged investment was or when it had been acquired.  We question whether a competent tax professional would prepare a return claiming a loss of this magnitude in the absence of any documentary evidence establishing the facts surrounding the investment.  Indeed, Mr. Perlson could not explain how he derived the $2,998,850 basis number that he reported on the return.  In any event it is obvious that petitioners did not supply their accountant with all "necessary and accurate information" concerning the alleged investment.  See Neonatology Assocs., P.A., 115 T.C. at 99.  We accordingly sustain respondent's determination of an accuracy-related penalty.

To reflect the foregoing,

Decision will be entered for

respondent.