FEDERATED GRAPHICS COMPANIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HERBERT SCHARER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Federated Graphics Cos. v. Commissioner
Docket Nos. 5336-89, 5793-90
United States Tax Court
T.C. Memo 1992-347; 1992 Tax Ct. Memo LEXIS 368; 63 T.C.M. (CCH) 3153; 15 Employee Benefits Cas. (BNA) 2963; June 16, 1992, Filed *368 Decision will be entered under Rule 155. Petitioner Herbert Sharer effectively controlled petitioner Federated Graphics Companies, Inc., and Federated's pension plan. Scharer caused those entities to issue two sets of checks: (1) A series of checks drawn on Federated's bank accounts and issued to or on behalf of a third party, which checks petitioners claim represent loans by Federated to the third party, and (2) a series of checks drawn on the pension plan's bank account, which petitioners claim were to make pension plan investments and which respondent claims were distributions to Scharer. (1) Held: R did not err in disallowing Federated's bad debt deduction. (2) Held, further: R erred in determining that Federated is liable for additions to tax for fraud under sec. 6653(b)(1) and ( 2), I.R.C., and, alternatively, for additions to tax for negligence under sec. 6653(a)(1) and ( 2), I.R.C.
(3) Held, further: R did not err in determining that Federated is liable for an addition to tax for substantial understatement under sec. 6661, I.R.C.
(4) Held, further: R erred in determining that petitioner Herbert Scharer had additional income on account of forgiveness *369 of indebtedness or a constructive dividend. (5) Held, further: R did not err in determining that Scharer had additional income on account of distributions under Federated's pension plan. (6) Held, further: R did not err in determining that Scharer is liable for additions to tax under secs. 6653(a)(1) and (2) and 6661, I.R.C.
Bernard S. Mark, Richard S. Kestenbaum, and Robert E. Greenberg, for petitioners. Rose E. Gole, Rosemarie Camacho, and Donald Schwartz, for respondent. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: These consolidated cases involve the following determinations by respondent of deficiencies in and additions to petitioners' Federal income tax: Docket No. 5336-89 FEDERATED GRAPHICS COMPANIES, INC.
Tax Year
Additions to Tax [1]
Ended
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
3/31/83
$ 164,322.58
$ 8,216.13
50% of the interest
due on $ 164,322.58
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
$ 82,161.29
50% of the
$ 41,080.65
interest due
on $ 164,322.58
Docket No. 5793-90 HERBERT SCHARER
Tax Year
Additions to Tax
Ended
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
12/31/83
$ 800,440
$ 40,022
50% of the
$ 200,110
interest due
on $ 800,440
*370 In addition, in her answer to the petition of Federated Graphics Companies, Inc. (Federated), respondent determined that Federated is liable for an addition to tax under section 6651(a)(1). Respondent has since conceded that addition. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. With respect to petitioner Federated Graphics Companies, Inc., the issues for our decision are: (1) Whether respondent erred in disallowing a bad debt deduction in the amount of $ 400,256.44 for the taxable year ended March 31, 1983. We hold that respondent did not so err. (2) Whether respondent erred in determining additions to tax for fraud under section 6653(b)(1) and (2). We conclude that respondent has failed *371 to carry her burden of proving fraud. (3) Whether respondent erred in determining, in the alternative to additions to tax for fraud, additions to tax for negligence under section 6653(a)(1) and (2). We conclude that respondent here bears the burden of proving negligence but has failed to carry that burden. (4) Whether respondent erred in determining an addition to tax for a substantial understatement of income tax liability under section 6661. We hold that respondent did not so err. With respect to petitioner Herbert Scharer (Scharer), the issues for our decision are as follows: (1) Whether respondent erred in determining additional income in the amount of $ 400,256.44 as the result of a forgiveness of indebtedness to Federated or as the result of a constructive dividend from Federated. We hold that respondent did so err. (2) Whether respondent erred in determining additional income in the amount of $ 768,000 on account of distributions from Federated's pension plan. We hold that respondent did not so err. (3) Whether respondent erred in determining additions to tax for negligence under section 6653(a)(1) and (2). We hold that respondent did not so err. (4) Whether respondent *372 erred in determining an addition to tax for substantial understatement of income tax liability under section 6661. We hold that respondent did not so err. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Federated maintained its principal place of business in New York, New York, during the years here in issue. Federated has since ceased doing business. Scharer resided in Lauderhill, Florida, at the time he filed his petition in this case. I. Federated Graphics Companies, Inc.
Federated is a New York corporation, incorporated in 1964. From its incorporation until some time in the early 1970's, Scharer was the sole shareholder of Federated. In the early 1970's, Scharer conveyed 50 percent of his shares in Federated to his son, Richard Scharer, and 50 percent to his son-in-law, Kenneth Lima. At the same time, Richard Scharer became president of Federated, and Kenneth Lima became vice president. Thereafter, Scharer neither owned any shares in Federated nor occupied any corporate office. Nevertheless, until Federated went out of business *373 (after the years in issue), Scharer continued to maintain authority over Federated and made most of Federated's operational, financial, and investment decisions. In 1979, Kenneth Lima resigned as vice president of Federated, left its employment, and transferred his shares to Richard Scharer, who became Federated's sole shareholder. During the years in issue, Federated provided the single corporate roof for separate printing-related businesses carried on by Scharer and his son. Each acted as a broker and consultant to buyers of commercial printing services. Scharer paid little attention to the corporate form, however, which was used by him as a matter of convenience. Richard Scharer considered Federated to be his father's company, over which he had very little control. Federated occupied offices in the Chanin Building, at 122 East 42d Street, in New York City. Only a portion of the space Federated occupied in the Chanin Building was necessary for its printing-related activities. The remainder was held out for rental by Federated. Federated provided a common reception area for the offices that it rented out. It also provided certain standard office services, such as a receptionist *374 and secretarial services. II. Herbert Kaminsky
A. Introduction
In March 1981, Federated leased office space to one Herbert Kaminsky (Kaminsky). Kaminsky sometimes did business as "Kuwait Enterprises" or as "Premier Showcase". Kaminsky sometimes used the surname "Kaye". An identification report furnished by the Federal Bureau of Investigation shows Kaminsky to have had a criminal career beginning in 1944, spanning some 40 years, and involving various charges of, and convictions for, larceny and fraud. Scharer learned no later than January 1983 that Kaminsky had problems with the law. At that time, Kaminsky informed Scharer that he was being indicted for a diamond swindle. Kaminsky died in prison in 1986. B. The Kaminsky Transactions
In December 1981, Kaminsky approached Scharer and informed him that he, Kaminsky, had a friend who wanted to sell gold coins, for cash, in a transaction that could be concealed from the friend's wife. Scharer agreed to have Federated invest in the gold coins transaction, and he wrote a Federated check to Kaminsky dated December 28, 1981, in the amount of $ 9,660. A few days later, Kaminsky brought the coins to Scharer, but *375 Scharer told Kaminsky that he did not want the coins. Kaminsky responded that he could sell the coins at a profit, and Scharer agreed to that disposition. The same day, or the next, Kaminsky returned with some money, including Federated's profit, which Scharer deposited into Federated's bank account. The investment was reported as a loan on Federated's books. Shortly after the gold coins transaction, Kaminsky informed Scharer of another opportunity to make money. Kaminsky said that he had the chance to become involved in the purchase and sale of blue jeans, and Kaminsky offered to pay substantial interest if Scharer would loan him the necessary money on a short-term basis. Scharer agreed. After the second transaction, many Federated checks were written to Kaminsky or to others on his behalf. Scharer himself wrote roughly 70 Federated checks to Kaminsky or to others on Kaminsky's behalf. At Scharer's direction, Richard Scharer wrote a few others. The total of those checks is $ 696,684.31. Kaminsky repaid less than half of that amount. A schedule of Federated checks written to Kaminsky or on Kaminsky's behalf, the payments received by Federated from Kaminsky, and the net *376 balances is attached as an appendix. In 1981, Scharer's son-in-law, Kenneth Lima, founded Trans-Market Graphics, Inc. (Trans-Market), whose offices were located on Federated's premises. Trans-Market was indebted to Federated in the amount of $ 170,000. Trans-Market loaned Kaminsky the sum of $ 22,500, and received a promissory note in return. Scharer was upset about Trans-Market's transaction with Kaminsky. Scharer reduced Trans-Market's indebtedness to Federated and, in consideration thereof, Federated accepted Kaminsky's note to Trans-Market. [1]
Except as hereinafter discussed, no written agreements or other documents evidence the transactions set forth above. Scharer obtained no note (or other writing) from Kaminsky in connection with the gold coins transaction, but Kaminsky *377 signed notes for the subsequent transactions. Periodically, for convenience, Scharer converted the notes representing individual transactions into a series of notes, in equal amounts and with staggered due dates. Thus, on April 28, 1982, Kaminsky executed a series of 73 notes, payable to Scharer, all but 1 in the amount of $ 5,000, each carrying interest at the rate of 12 percent, and with due dates extending over a 73-week period. On October 1, 1982, Kaminsky executed a series of 11 notes, payable to Federated, all but 1 in the amount of $ 50,000, with interest at the rate of 12 percent, and with due dates extending over an 11-month period. In January 1982, Kaminsky executed a document purporting to evidence and collateralize certain loans. A loan of $ 5,300 on that date was to be collateralized by the delivery of 17 Piaget watches. Previous loans were to be collateralized by the delivery of "$ 40,000 CDs". The watches later were reclaimed by Kaminsky, who represented that he could sell them. Kaminsky also delivered to Scharer certain stones that he represented were diamonds. The stones proved to be worthless. Generally, the Federated checks made payable to Kaminsky (as *378 opposed to those written to third parties on Kaminsky's behalf) were cashed and converted into currency. All payments to Kaminsky or to third parties on his behalf and all payments by him to Federated were entered into Federated's cash disbursements and cash receipts books. Scharer characterized the payments to Kaminsky as loans in the books and records of Federated. On March 29, 1983, Kaminsky executed an affidavit of confession of judgment, confessing judgment and authorizing entry of a judgment against himself in the amount of $ 536,956.44, plus interest of $ 3,900. His affidavit stated further that: plaintiff [Federated] loaned money to defendant [Kaminsky] during 1981 and 1982. The above amount remains outstanding with interest since January 1, 1983 and has not been paid. The money was loaned for business development and should have been paid back by January 1, 1983. On April 4, 1983, the judgment by confession was docketed against Kaminsky, in favor of Federated, in Bronx County, State of New York, for those amounts. III. Federated's Pension Plan
A. Introduction
In the late 1970's, Federated adopted the Federated Graphics Employee Pension Plan (Pension *379 Plan). Pursuant to the Pension Plan, Federated made contributions in trust for the benefit of plan participants. Plan participants included Scharer, Richard Scharer, and Carolyn Stasenko. Carolyn Stasenko was an employee of Federated. During the years in question, she was also Scharer's girlfriend. In 1984, she became his wife. From the inception of the Pension Plan through March 31, 1983, Federated's contributions on behalf of plan participants exceeded $ 1 million. Of that amount, over $ 900,000 was contributed on behalf of Scharer; approximately $ 37,000 was contributed on behalf of Richard Scharer, and approximately $ 20,000 was contributed on behalf of Carolyn Stasenko. Scharer and Richard Scharer were named as trustees of the trust established pursuant to the Pension Plan (the Pension Trust). B. The Stasenko Trust
In 1978, Scharer, as grantor, entered into an agreement of trust with Richard Scharer, as trustee, for the benefit of Carolyn Stasenko (the Stasenko Trust). Pursuant to that agreement, Carolyn Stasenko, for her life, was to enjoy the income from the trust assets. On her death, the trust assets were to be divided among Scharer's children. C. James *380 Couri
In May 1981, Federated rented an office to one James Couri (Couri). Couri is a self-described private investor and management consultant. He is also a convicted felon, as will be described. During the years in issue, Couri was president of Tandem Trading Corp. (Tandem). Tandem was formed for the purposes of management consultancy and investments. Initially, Couri rented one of Federated's small offices, in the rear of Federated's space. That office was sparsely furnished, with furniture provided by Federated. During the first year of his tenancy, Couri rarely was in the office and had little contact with Scharer. Beginning in early 1983, however, Couri was in the office more often. He conversed frequently with Scharer, telling Scharer of his investments. Scharer relied on stock tips received from Couri, which tips proved worthwhile. At about that time, Couri moved to a bigger office in the Federated space, which he furnished and decorated himself. That office was much closer to Scharer's office. In March 1983, Couri asked Scharer for $ 6,000 so that he could continue to hold, and would not have to liquidate, certain shares of stock. He promised Scharer one-half *381 of the profit to be made. Scharer issued a Federated check to Tandem in the amount of $ 6,000. No repayment was ever received. In June 1983, Couri approached Scharer with a similar deal for which he needed $ 65,000. Scharer caused the Pension Trust to issue a check in that amount to Tandem. No repayment was ever received. In 1981, Couri had been convicted of (1) submitting false statements to a Federally insured bank and (2) manipulation of securities trading. Couri was on probation with regard to those convictions when Scharer first met him. D. Caltan Holding Co.
In June 1983, Richard Scharer, as trustee of the Stasenko Trust, and Tandem (Couri's corporation) entered into an agreement of partnership (the Caltan Agreement), to do business as Caltan Holding Co. (Caltan). The Caltan Agreement states that: WHEREAS TANDEM TRADING CORP. is interested in managing investments, securities and business properties, and WHEREAS the Trust is interested in acquiring business properties, investing its own funds for profit. * * * 2. Caltan shall establish a business for the purchase and trading and investing of securities and the purchase of [sic] handling business properties. *382 The Stasenko Trust was obligated to make an initial capital contribution of $ 100,000 to Caltan. Couri was to manage the partnership, with Scharer's advice and consent on the Stasenko Trust's behalf. [EDITOR'S NOTE: TEXT WITHIN THESE SYMBOLS [O> <O] IS OVERSTRUCK IN THE SOURCE.] As presented to Couri for execution on behalf of Tandem, the Caltan Agreement specified that profits would be allocated as follows: (after the payment of expenses, taxes, and certain other amounts) "10% of the net profit shall be the share allocatable [sic] to TANDEM and 90% shall be the share allocatable [sic] to the Trust." Before he would sign the Caltan Agreement, Couri required that the division-of-profits clause be modified to read as follows: "10% of the [O> net <O] gross profit shall be the share allocatable [sic] to TANDEM and 90% shall be the share allocatable [sic] to the [O> Trust <O] Partnership equally." In late June and early July 1983, Scharer funded Caltan with $ 100,000 on behalf of the Stasenko Trust, as called for by the Caltan Agreement. E. Couri and the Pension Plan
Sometime in the spring of 1983, Scharer discussed with Couri the rate of return being earned on the *383 assets in the Pension Trust. Couri suggested that that rate of return was poor and that he knew an investment manager, Bob Grossman (Grossman), who could increase that rate. Subsequently, Couri introduced Scharer to Grossman, who worked for the firm of Cantor, Fitzgerald & Co. Scherer was impressed with Grossman. Scharer caused the Pension Trust to invest over $ 750,000 with Cantor, Fitzgerald & Co.Cantor, Fitzgerald & Co. lost $ 80,000 of that amount during the first month of its stewardship. On learning of that loss, Couri told Scharer that he felt some obligation to Scharer because of that loss and that he would be willing to manage the Pension Trust assets. The remaining funds in the hands of Cantor, Fitzgerald & Co. were returned to the possession of the Pension Trust. Scharer then caused the Pension Trust to issue three checks to Caltan, totaling $ 703,000, during the period August 1983 through October 1983. The Pension Trust has not been repaid the $ 703,000 paid to Caltan. Several lawsuits have been initiated by Scharer and Federated against Couri, Tandem, and Caltan. That litigation commenced in 1984. None of the suits had been settled as of the trial herein. *384 Neither the Pension Trust nor the Pension Plan is, by name, a plaintiff in any of those suits. As a cause of action in one suit, styled Herbert Scharer, Plaintiff, against James Couri, Defendant, in the Supreme Court of the State of New York, County of New York, the following is included: "The defendant promised the plaintiff that he would use the aforedescribed financial instruments to invest them on behalf of the plaintiff and on behalf of certain pension and trust funds that the plaintiff was the trustor of." Scharer claimed that "The defendant, in breach of his agreement with the plaintiff, misappropriated the plaintiff's funds and financial instruments to his own benefit and to the detriment of the plaintiff." Damages in the amount of $ 213,800 are requested. As an additional cause of action, an accounting is demanded. In turn, Couri and Tandem have made their own claims and counterclaims against Scharer, Federated and the Stasenko Trust. OPINION I. The Kaminsky Transactions
A. Federated Graphics Companies, Inc.
1. Background
Federated filed a U.S. Corporation Income Tax Return for its taxable year ended March 31, 1983. On that return, Federated claimed *385 a bad debt deduction in the amount of $ 440,256.44. In her notice of deficiency to Federated, respondent disallowed a portion of that deduction, or $ 400,256.44. In that notice, respondent stated that the amount disallowed represented "alleged" loans receivable from Herbert Kaminsky, which had been written off as uncollectible. Respondent justified her disallowance on the grounds that: (1) Federated has not shown that the debt arose from a true debtor-creditor relationship or that there was a legitimate business purpose for such debt and (2) Federated, in any event, has not established that such debt became worthless in its taxable year ended March 31, 1983. Alternatively, respondent justified her disallowance on the ground that the amount in question represented moneys diverted from Federated for Scharer's personal use. In its petition, Federated assigned error to respondent's disallowance of its bad debt deduction in the amount of $ 400,256.44. By amendment to its petition, Federated assigned error to respondent's failing to allow, as an alternative to the disallowed bad debt deduction, a theft loss in an equal amount. Finally, in its petition, Federated alleged that respondent's *386 notice of deficiency and the assessment of tax and additions were barred by the statute of limitations. [2] In support of its assignments of error, Federated avers that it lent the sums in question to Kaminsky, at interest; that such loans were evidenced by promissory notes; that, on March 29, 1983, following Kaminsky's failure to repay, Kaminsky executed an affidavit of confession of judgment, which was entered against him; that such judgment and the underlying loans have not been, and cannot be, collected; and that Kaminsky is dead. Federated further avers that the loans were bona fide, arose in its trade or business, and became wholly worthless during its taxable year ended March 31, 1983. It avers that none of the sums in question were diverted to Scharer's personal use. Finally, it avers that Kaminsky was a convicted felon, who defrauded Federated of $ 400,256.44. As to all of those averments, Federated bears the burden of proof. Rule 142(a). *387 2. Bona Fide Debtor-Creditor Relationship
Section 166 allows a deduction for debts that become wholly or partially worthless during the taxable year. Only a bona fide debt qualifies for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. A bona fide debt is a debt that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Id. It must clearly be shown that the intention of the parties was to create a debtor-creditor relationship. Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953); Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). We have recently identified our task in this kind of case as follows: The decided cases considering the question whether a purported debt is in fact a debt for tax purposes set forth various tests and criteria; in the final analysis, however, the question depends on the facts and circumstances of each case, with the taxpayer bearing the burden of proof. We must examine the facts before *388 us in light of "the realities of the business world and the manner in which transactions are handled in the normal and ordinary course of doing business." [Kean v. Commissioner, 91 T.C. 575, 594-595 (1988); citations omitted.] We will do the same here. The record indicates that, over an approximately 1-year period, Scharer caused Federated to issue over 70 Federated checks to Kaminsky or to others on Kaminsky's behalf. Those checks were drawn on Federated's bank accounts and were in various amounts, totaling $ 696,684.31. The average check was for approximately $ 10,000. The disbursements represented by these checks were entered into Federated's cash disbursements journal. They were characterized mostly as loans in the books and records of Federated. [3] There were no written loan agreements. *389 Nevertheless, Kaminsky executed interest-bearing notes for each. Eventually, Kaminsky confessed judgment in the amount of $ 536,956.44, with interest of $ 3,900. Scharer testified to the nature of the transactions in question: that all of them, after the initial transaction involving gold coins, were loans, made by Federated, with respect to which repayment was expected, and interest was to be earned. Indeed, a schedule prepared by Federated's accountant indicates that, on over 25 occasions, Kaminsky made payments to Federated. Those payments totaled $ 349,727.87; they were entered into Federated's cash receipts book as loan repayments. On their face, the transactions in question appear to be loans, the worthlessness of which would be deductible under section 166(a). However, there are irregularities. For instance, we cannot match up the notes in evidence with the balances outstanding on the dates those notes were executed. We are sure that the purported collateral was insufficient, and the diamonds received as collateral turned out to be worthless. Nevertheless, this is not a case where some alternative to characterization as a loan is readily apparent, such as a disguised *390 gift or a contribution to the capital of a corporation. See, e.g., McCain v. Commissioner, T.C. Memo. 1987-285. We do share with respondent some skepticism as to Scharer's motivation in continuing to advance money to Kaminsky when it must have become painfully obvious that advancing additional money was probably a losing proposition. One indicia of a bona fide debtor-creditor relationship is a reasonable expectation of repayment in light of the economic realities of the situation. Kean v. Commissioner, supra at 598. We accept, however, as reasonable and genuine, Scharer's explanation that he kept advancing money to Kaminsky in the hope that his marginal outlays would be less than his marginal recoveries. Indeed, as the appendix shows, during September 1982, Kaminsky reduced the net balance owing to Federated by some $ 125,000. We thus conclude that Scharer did not lack an expectation of repayment, even after a more prudent businessman would surely have abandoned Kaminsky. In respondent's opening statement, her counsel stated respondent's theory to be that the checks made payable to Kaminsky were only to Kaminsky by way of convenience *391 and that the checks immediately were cashed and all or a substantial portion of that cash went back to Scharer. Respondent failed to introduce any evidence that directly supports her theory. On brief, respondent argues that an inference can be drawn that all amounts reported by Federated as loans were, in fact, not loans but rather "investment transactions". Respondent does not describe what kind of investment transactions occurred, suggesting only that some kind of below-board transaction, such as money laundering, occurred. Again, that is speculation on the part of respondent, because such inference is not supported in the record. Perhaps the only reliable explanation of Scharer's behavior with regard to Kaminsky comes from his son, Richard Scharer. We found Richard Scharer's testimony to be forthright and credible. Richard correctly judged Kaminsky's character from the beginning. He testified that he had refused his father's offer to become involved in the gold coins transaction because he found Kaminsky "blatantly [to be] such an unsavory character". With regard to his father, he testified: I think my father had the ability in his business to make a lot of money with *392 not that much effort at that stage of his life and in my mind he became bored with the everyday carrying on of the work. I think he looked at Mr. Kaminsky as kind of a vacation from everyday life, a way to indulge perhaps in his characteristic -- his description of him as a Damon Runyon type of character, and it gave him an opportunity to, as I say, enjoy himself with another type of person he had not enjoyed himself with before. Richard further testified that, on previous occasions, his father had made loans or investments with people like Kaminsky. He had concluded that there was a kind of sickness on his part, a susceptibility [to such people]. * * * That's why it wasn't hard for me, having seen this take place, after working with my father for 14 or 15 or 16 years at that time, that here was another individual like that, that was a con artist, so it wasn't a mystery to me. We hesitate to conclude that Scharer was innocent of Kaminsky's character and, in that sense, conned by him; we find more plausible that Scharer had at least some inkling of Kaminsky's character, which might even have attracted him to Kaminsky. Scharer may have been unwise, even reckless, in giving *393 money to Kaminsky, yet we cannot conclude that he expected to be fleeced by him. As unrealistic as his expectation may have been, we accept Scharer's testimony that he expected to be repaid by Kaminsky. In form, the transactions were loans, and when Federated was not repaid, it obtained a judgment by confession against Kaminsky. We have accepted that Scharer had an expectation of repayment. Respondent, although asking us to infer a great many things from the record, has not introduced into evidence anything sufficient to undermine Federated's case concerning the bona fides of such loan transactions. We thus conclude that Federated has carried its burden of proving that the transactions in question constituted bona fide loans. [4]
We also conclude that the loan transactions *394 in question were between Federated and Kaminsky, and did not involve the diversion of moneys for Scharer's personal use. There is no evidence that Scharer received kickbacks from Kaminsky. Except with regard to one series of notes that were made payable to Scharer, the books and records of Federated, and the notes executed by Kaminsky, consistently treat all payments and repayments as being between Federated and Kaminsky. We accept Scharer's explanation that the series of notes to him were mislabeled, and that the intended payee was Federated. Moreover, we have no doubt that, although Scharer was not an officer of Federated during the years here in question, he had the practical authority to use corporate funds as he saw fit and, as an agent of Federated, to make the loans in question to Kaminsky. Richard Scharer, the only officer and sole shareholder of Federated, testified that Federated was his father's company, over which he had very little control. At least by inaction, Richard acquiesced in his father's actions. Long ago, we concluded that we should not inquire into the motives of a corporation's officers in making a loan or whether or not such loan was an ultra vires *395 act. Cooper-Brannan Naval Stores Co. v. Commissioner, 9 B.T.A. 105, 108 (1927). Furthermore, we will neither disregard the corporate entity nor impute a distribution to Scharer or Richard Scharer. See generally Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). 3. Worthlessness
A bad debt is deductible in the taxable year during which it becomes wholly or partially worthless. Sec. 166(a). Here, Federated has the burden of proving that some or all of $ 400,256.44 in loans to Kaminsky became worthless in its fiscal year ended March 31, 1983. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981). There is no standard test or formula for determining worthlessness within a given taxable year; the determination must depend upon the particular facts and circumstances of the case. Crown v. Commissioner, supra at 598. However, it is generally accepted that the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Id.
Scharer continued to loan significant amounts of money to Kaminsky *396 through November and December of 1982. Scharer testified that, in January 1983, he learned for the first time of Kaminsky's criminal background, when Kaminsky gave him some paper that indicated that he was being indicted for a diamond swindle. Scharer testified that he immediately visited Carol Lilienfeld (Lilienfeld), Federated's counsel, and instructed her to start a suit against Kaminsky. Thereafter, Scharer testified, Lilienfeld telephoned him and told him that her investigation had led her to believe that it would be very difficult to bring suit against Kaminsky. Nevertheless, Lilienfeld succeeded in causing Kaminsky to execute, on March 30, 1983, an affidavit of confession of judgment. In that affidavit, Kaminsky confessed judgment, in the amount of $ 536,956.44, with interest of $ 3,900. The judgment by confession was docketed on April 4, 1983. Subsequently, on April 16, 1984, Kaminsky was deposed by Lilienfeld. The deposition is brief, because Kaminsky is a reluctant deponent, refusing to answer most questions on the basis of his Fifth and Sixth Amendment rights. Clearly, however, Lilienfeld was inquiring primarily about collecting on the judgment against Kaminsky. *397 She asked Kaminsky whether he then had the money to pay the judgment; whether he was currently employed; whether he intended, sometime in the future, to declare bankruptcy; and whether he expected, in the near future, to have enough money to pay his debt. Kaminsky refused to answer all questions on constitutional grounds. Even if we were to accept all of Scharer's testimony as accurate, the facts set forth are insufficient for us to conclude that Federated has carried its burden of proof. Certainly, a judgment by confession with respect to a debt does not equate with worthlessness of the debt. At best, here, we have Federated's counsel telling Scharer sometime before the close of the taxable year in question that it would be hard to sue Kaminsky. Even had Lilienfeld gone further and told Scharer that collection was doubtful, such a statement to Scharer, standing alone, would have been insufficient to establish worthlessness without a showing of the facts upon which it was based. Alemite Die Casting & Manufacturing Co. v. Commissioner, 1 B.T.A. 548, 550-551 (1925). The deposition, occurring after the close of the taxable year here in question, is evidence *398 that, even then, Lilienfeld was carrying on her investigation as to the possibility of collecting on the debt. Kaminsky died in prison in 1986, and we feel confident that Federated must have, at some time, suffered the worthlessness of the Kaminsky debt. Federated has not, however, carried its burden of proof that worthlessness occurred during its taxable year ended March 31, 1983. Accordingly, we sustain respondent's disallowance of Federated's bad debt deduction in the amount of $ 400,256.44. 4. Theft Loss
Any loss arising from theft is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. Sec. 1.165-8, Income Tax Regs. It has long been settled that losses and bad debts are mutually exclusive and that a bad debt is deductible according to the rules of section 166 or not at all. See Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 189 (1934); Tharp v. Commissioner, T.C. Memo. 1972-10. As an alternative to assigning as error respondent's failure to allow a bad debt deduction, Federated has assigned as error respondent's failure to allow it a loss under section 165(a) on account *399 of the theft by Kaminsky of the sums in question. We have concluded that the transactions between Federated and Kaminsky constituted bona fide loan transactions, for which worthlessness in Federated's fiscal year ended March 31, 1983, has not been proven. Therefore, by implication, we have rejected Federated's theft argument in reaching that conclusion. B. Herbert Scharer
Herbert Scharer filed a U.S. Individual Income Tax Return for calendar year 1983. In her notice of deficiency dated December 29, 1989, respondent determined a deficiency based in part on Scharer's failure to report income in the amount of $ 400,256.44. Respondent explained that such income resulted from the forgiveness by Federated of Scharer's indebtedness to Federated in that amount. Federated, respondent claimed, had advanced $ 400,256.44 either to Scharer or to third parties on his behalf. Alternatively, respondent claimed that such sum represented a constructive dividend paid to Scharer by Federated. In her notice, respondent noted that $ 400,256.44 represents the loans-receivable balance from Kaminsky. In his petition, Scharer assigned error to respondent's determinations. We have concluded *400 that the $ 400,256.44 in question represents bona fide loans by Federated to Kaminsky, and not a diversion of funds for Scharer's personal use. Accordingly, we do not sustain respondent's determination of a deficiency based on the inclusion in Scharer's income of a like amount, either as cancellation of indebtedness income or as a constructive dividend. II. Pension Plan Transactions
A. Background
Respondent determined an additional deficiency in Scharer's 1983 individual income tax on account of distributions to him from the Pension Trust in the amount of $ 768,000. [5] Respondent increased Scharer's gross income by that amount and explained her adjustment as attributable to transfers from the Pension Trust to Caltan or Tandem, at Scharer's request, and for his personal use or benefit. The individual transfers in question were: (1) The June 1983 Pension Trust check to Tandem in the amount of $ 65,000, and (2) the August to October 1983 Pension Trust checks to Caltan, totaling $ 703,000. Alternatively, respondent increased Scharer's gross income by the amount of $ 718,000 on account of loans to him in an impermissible amount from the Plan. Since neither party has pursued *401 that alternative explanation, and we believe it appropriate to decide the distribution issue on the basis of respondent's first ground, we will not further discuss respondent's alternative ground. In his petition, Scharer assigned error to respondent's determination with regard to distributions from the Pension Trust. In support of his assignment of error, Scharer averred that both the $ 65,000 paid to Tandem and the $ 703,000 paid to Caltan were amounts invested on behalf of the Plan and were not distributions to Scharer. In particular, with regard to the $ 703,000 paid to Caltan, Scharer averred that, by amendment to the Caltan Agreement, the Pension Trust had become a partner in Caltan and the $ 703,000 was a capital contribution *402 by the Pension Trust on its own behalf. Scharer further averred that the original Caltan Agreement had been amended so that the Pension Trust had a 45-percent interest in profits, the Stasenko Trust had a 45-percent interest, and Tandem had a 10-percent interest. On brief, Scharer appears to have abandoned the argument that the Pension Trust had a 45-percent interest in the profits of Caltan. Scharer has proposed as a finding of fact that, under the amended Caltan Agreement, Tandem would receive 55 percent of the gross partnership profits and the Pension Trust and the Stasenko Trust would share 45 percent of such profits. At the conclusion of the trial of these cases, petitioner Scharer advised the Court that he wished to file a motion, pursuant to Rule 41(b), to amend the pleadings to conform to the evidence. Later, on April 12, 1991, Scharer filed such a motion. Rule 41(b). Scharer seeks to amend his petition to add that, if the Court determines that Scharer received additional income from the Pension Plan distributions, then Scharer has suffered a loss, under section 165, in the amount of those payments. Respondent objects to our granting petitioner's motion. As to all *403 of his factual averments, Scharer bears the burden of proof. Rule 142(a). B. The Checks to Caltan
1. Did Scharer Receive a Taxable Distribution?
Section 402(a)(1) provides generally that amounts distributed to the beneficiary of a tax-exempt employees' pension trust are taxable to the beneficiary in the year distributed pursuant to the provisions of section 72 (relating to annuities). Whether the $ 703,000 in Pension Trust checks to Caltan represent taxable distributions to Scharer from the Pension Trust for purposes of section 402(a)(1) is essentially a question of fact, to be determined on the basis of the entire record before us. See Fuller v. Commissioner, T.C. Memo. 1980-370. Scharer has not argued that, to the extent that we find that the amounts in question were distributions to him, less than all of such amounts properly are includable in gross income under section 72. Thus, to the extent we determine that such distributions were taxable to Scharer, they are includable in his gross income. There is no argument but that Scharer caused $ 703,000 of Pension Trust funds to be paid to Caltan. Scharer argues that that amount was in exchange *404 for a share of Caltan's profits. He concedes that Caltan originally was established to benefit the Stasenko Trust, but argues that, when Couri agreed to manage the assets of the Pension Trust, the Caltan Agreement was modified to make the Pension Trust one of the partners in Caltan. [6] Scharer argues that the Stasenko Trust and the Pension Trust were to divide 45 percent of Caltan's profits. There is little, however, other than Scharer's testimony to convince us that the Pension Trust, indeed, was a partner in Caltan. For the Pension Trust to have become a partner in Caltan would have required the agreement of the existing partners. See N.Y. Partnership Law sec. 40(7) (McKinney 1988). Those partners were Tandem and the Stasenko Trust. Couri, president of Tandem, testified that the Pension Trust was never a partner in Caltan. We have our doubts about Couri's veracity and motivation for testifying. Thus, we accord no weight to his testimony. The other partner was the Stasenko Trust, of which Richard Scharer was the only trustee. We found Richard Scharer's testimony to be forthright and credible, when offered in connection with the Kaminsky transactions. Richard was questioned *405 about whether the Pension Trust was a partner in Caltan. He testified that he could not recall its initially being a partner. He further testified that he did not know whether, after that, his father and Couri reached any different agreement. Richard Scharer's testimony is of no help to his father. Thus, we have only his father's word that the Pension Trust was a partner in Caltan. He testified that there were copies of the Caltan Agreement that show that 45 percent of the partnership's profit was to be divided between the Stasenko Trust and the Pension Trust. [7] He was not, however, able to produce such a copy. Richard Scharer could not identify the Pension Trust as a partner of Caltan, and, for that reason alone, we conclude that it was not a partner. N.Y. Partnership Law sec. 40(7) (McKinney 1988). *406 Neither can we conclude that, informally, in some way did the Pension Trust have a right to partake in Caltan's profits. Scharer invested Pension Trust money with Caltan. Did he do so as an agent of the Pension Trust? That would depend on Scharer's intent in placing the Pension Trust money with Caltan. For that, we have only his word. We did not find him always forthright. Throughout much of his testimony, we felt that there were things that he was hiding. On the question of his intent, one could infer that he placed the Pension Trust money with Caltan to benefit the Stasenko Trust, which, on the face of the Caltan Agreement, had the only interest in the partnership other than Tandem's. The primary beneficiary of the Stasenko Trust was Carolyn Stasenko, whom Scharer married in 1984. The ensuing litigation between Scharer and Couri, that Scharer would make so much of, does not indicate unequivocally that Scharer's intent was to benefit the Pension Trust when he invested Pension Trust funds in Caltan. The Pension Trust is not, by name, a party to any of the suits. It is, however, mentioned, albeit in one cause of action in one suit. Along with Scharer and the Stasenko Trust, *407 the Pension Trust presumably would only share the $ 213,800 in requested damages and be entitled to an accounting. Perhaps once the accounting is obtained, the Pension Trust will pursue a claim for the over $ 700,000 that Scharer would have us believe he invested on its behalf (but which was lost). Considering the record as a whole, however, we are unconvinced that, when Scharer placed Pension Trust funds with Caltan, he was acting as an agent of the Pension Trust. We conclude that Scharer has failed to carry his burden of proving that the Pension Trust was a partner in Caltan or that he otherwise invested Pension Trust funds in Caltan on behalf of the Pension Trust. Accordingly, we hold that the $ 703,000 of Pension Trust funds paid to Caltan constituted a distribution to Scharer within the meaning of section 402(a)(1). See Adams v. Commissioner, T.C. Memo. 1970-104, affd. per curiam 456 F.2d 259 (9th Cir. 1972). 2. Did Scharer Suffer a Theft Loss?
As stated previously, Scharer has moved to amend his petition to raise the issue of a loss suffered under section 165, should we find a distribution to him from the Pension Plan. See Rule *408 41(b)(1). Respondent objects on the grounds of prejudice and surprise. Whether a motion seeking an amendment to conform a pleading to the evidence should be allowed is within the sound discretion of the Court, and the exercise of that discretion must be controlled by sound reason and fairness. Commissioner v. Estate of Long, 304 F.2d 136 (9th Cir. 1962), affg. unreported orders of this Court; Law v. Commissioner, 84 T.C. 985, 989-990 (1985). Respondent claims that she has had no opportunity to question Couri respecting the losses suffered by Caltan. Given that Couri was her witness and testified as to the losses suffered by Caltan, we find her argument unpersuasive. We grant Scharer's motion for leave to amend his petition, and the amendment to petition lodged with Scharer's motion will be filed with the Court. Having granted Scharer's motion, we must now consider the substantive issue. On brief, Scharer makes clear that he is claiming a theft loss under section 165(c)(3). Scharer refers us to the definition of larceny in the appropriate New York statute. See N.Y. Penal Law sec. 155.05 (McKinney 1988). Under New York penal law, larceny *409 may be committed by obtaining property by false pretenses or a false promise. N.Y. Penal Law sec. 155.05(2)(a), (d) (McKinney 1988).[8] The element of intent is crucial to a prosecution for false promise, "because, where a defendant's failure to perform his promise is nothing more than a failure to pay his debts or an inability to perform contractual obligations, his conduct is simply a breach of contract, a civil wrong, and does not amount to larceny". People v. Carey, 479 N.Y.S.2d 789, 790 (App. Div. 1984); People v. Churchill, 390 N.E.2d 1146, 1150 (N.Y. 1979). "A finding of larcenous intent * * * must exclude to a moral certainty any implication that the defendant has committed a mere civil wrong." People v. Luongo, 391 N.E.2d 1341, 1345 (N.Y. 1979). We do not require Scherer to demonstrate "to a moral certainty" that Couri has committed larceny. Nevertheless Scharer has not met his burden of showing that Couri has committed larceny. The facts here do not compel such a conclusion. Scharer testified that, in attempting to recover the Pension Plan assets, he visited the F.B.I. and a New York assistant district attorney. *410 That in and of itself proves nothing. Scharer has provided neither details of his complaints to those authorities, nor any corroboration that those visits indeed occurred. Scharer also claims to have filed six suits against Couri. Of course, his pursuit of civil redress is not incompatible with a theft by Couri. The record, however, contains very little information about those six lawsuits. Scharer has provided us only with a copy of a complaint, supposedly in one of those suits, that is neither signed by Scharer as the plaintiff nor includes any notations confirming that it was actually filed in New York State court. Further, that complaint merely states, in relevant part, that Couri, in breach of his agreement with Scharer, misappropriated Scharer's funds to his own benefit and to Scharer's detriment and that, therefore, Couri breached his contract with Scharer and is liable for damages in the amount of $ 213,800. As with Kaminsky, we do not dispute that Couri had a criminal record; he may have been even stealing from Scharer. Considering the record before us, however, we cannot conclude that Scharer has carried his burden of proving that a theft occurred. *411 C. The Check to Tandem
In June 1983, Couri approached Scharer with a request for $ 65,000, so that Couri could continue to hold, and would not have to liquidate, certain shares of stock. Scharer caused the Pension Trust to issue a check in that amount to Tandem. No repayment was ever received. As with the Pension Trust checks to Caltan, respondent has determined that that transaction gave rise to a taxable pension distribution to Scharer. We agree, because we are constrained to conclude that that "investment" was contributed to Caltan. Initially, that investment was, at least in form, between the Pension Trust and Tandem. Had it remained so, we might conclude that, unlike the Caltan transaction, no one was to be benefited from this investment other than the Pension Trust. Couri has testified, however, that the $ 65,000 investment was put into Caltan at some point. Scharer's testimony is not contradictory. Moreover, Scharer has requested as an ultimate finding of fact that the Pension Trust invested $ 768,000 with Caltan. We believe that that $ 768,000 includes the $ 65,000 in question. Accordingly, we conclude that, ultimately, the $ 65,000 investment in question *412 found its way into Caltan and that such investment should be treated the same as the $ 703,000 directly invested in Caltan. We hold that the $ 65,000 investment in question constituted a distribution to Scharer in 1983, within the meaning of section 402(a)(1). As with the Pension Trust checks directly written to Caltan, no theft loss is allowable. III. Additions to Tax
A. Federated Graphics Companies, Inc.
1. Fraud
Respondent has determined that, for its taxable year ended March 31, 1983, Federated is liable for additions to tax for fraud. See sec. 6653(b)(1) and (2). Respondent bears the burden of proof with regard to additions for fraud. Sec. 7454(a); Rule 142(b). Respondent must prove fraud by clear and convincing evidence. Rule 142(b); Green v. Commissioner, 66 T.C. 538, 549 (1976). Respondent has not carried her burden. Fraud is not defined in the Code. It has been defined to mean "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); see also *413 Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958). The existence of fraud is a question of fact to be ascertained from all of the evidence. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). In her opening and reply briefs, respondent rests her fraud case almost entirely on what she considers irregularities in connection with the Kaminsky transactions. She points out the erroneous book entry, by which Federated recorded the first transaction with Kaminsky, the gold coins transaction, as a "loan", when, indeed, it was not. She labels the promissory notes received from Kaminsky as fictitious. She claims that the judgment by confession obtained against Kaminsky was for tax purposes only. Running through her whole fraud case is a single theme: that "Federated's persistence in characterizing the * * * [Kaminsky] transactions as a bad debt despite the overwhelming evidence to the contrary demonstrates its fraudulent intent." Since we have found that the Kaminsky "loans" were indeed loans, we reject respondent's theme. We do not think that the "irregularities" *414 that she particularizes constitute fraud. In some instances, they are inconsequential, such as with the misbooking of the gold coins transaction, while in others we disagree with her factual premise, such as that the promissory notes were fictitious. From the record as a whole, we conclude that respondent has not carried her burden of proof. 2. Negligence
In her answer, respondent determined that, in the alternative to additions to tax for fraud, Federated is liable for additions to tax for negligence. See sec. 6653(a)(1) and (2). Respondent bears the burden of proof. Rule 142(a). We conclude that she has failed to meet that burden. Section 6653(a) provides a two-part addition to tax if any part of an underpayment of income taxes is due to negligence or intentional disregard of rules or regulations (together, negligence). First, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment, any part of which is attributable to negligence. Second, section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable under section 6601 on that portion of the underpayment attributable to negligence. No addition to tax for negligence *415 will be made if the record shows that no part of the underpayment is due to negligence. Weis v. Commissioner, 94 T.C. 473, 486-487 (1990). Negligence has been defined as a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). In respondent's otherwise prolix opening brief (157 pages), she treats negligence as if it were a foregone conclusion. She relies on the "facts and law already set forth" relating to fraud as a sufficient basis for imposing additions for negligence. In her reply brief (also prolix at 72 pages), she does no better. Again, she makes the argument that Federated's negligence should be apparent from what she has adduced elsewhere. Perhaps being confused as to who has the burden of proof, she states that "Federated has offered no credible explanation for the taking of the improper bad debt deduction." [9] In response to Federated's argument that Federated relied on the advice of attorneys that it was entitled to a bad debt deduction, *416 respondent, in her reply brief, states: The only evidence that petitioners sought advice from experts is Scharer's own self serving, uncorroborated and incredible testimony. Petitioners were unable to produce a single witness to testify that Scharer sought any advice regarding the tax consequences of the * * * [Kaminsky] transaction or the Caltan transactions. We, however, direct respondent to Richard Scharer's testimony at trial, which flatly contradicts respondent's assertion. [10] As we have said previously, we found Richard Scharer to be forthright and credible in his testimony. In particular, we direct respondent to the following exchanges that occurred during cross-examination (by her attorney) of Richard Scharer: Q You are aware that the money given to * * * [Kaminsky] was deducted on the corporate tax returns of Federated for the fiscal year ending March 31st 1983, is that correct? A I certainly signed the return but I didn't focus on it until Mr. Melendez [an I.R.S special agent] brought it to my attention very forcefully. Q Did you consider there to be a business purpose of this debt with Mr. * * * [Kaminsky]? A It wasn't my decision to make that. I remember *417 him having the notes at the meeting with Mr. Acker and Todtman, Epstein and Young. I remember them looking at them and the advice from them was that it could be taken as a bad business debt, that it met the criteria that was set to do so. THE COURT: You heard them say that? THE WITNESS: Absolutely. [11]
Given our resolution of the substantive questions presented by the Kaminsky loans, the only question at issue *418 is whether Federated was negligent in determining such loans to be worthless in its taxable year ended March 31, 1983. Respondent has failed to carry her burden of showing negligence. Scharer claims that Carol Lilienfeld advised him that bringing suit against Kaminsky would be difficult. Such advice, if indeed it was given, was insufficient to prove the worthlessness of the Kaminsky debt. On its face, however, it does evidence some reliance on an expert. Respondent failed to call Lilienfeld to rebut that inference. In sum, respondent has not satisfied her burden of proving that Federated was negligent in claiming worthlessness in 1983. 3. Substantial Understatement
In her notice of deficiency, respondent determined that Federated substantially understated its income tax liability for the year at issue and is liable for the addition to tax under section 6661. The amount of the addition to tax for a substantial understatement of income tax for a taxable year, which addition is assessed after October 21, 1986, equals 25 percent of the amount of any underpayment attributable to such substantial understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). *419 See sec. 6661(b) (defining substantial understatement). Federated bears the burden of proving that it is not liable for such addition. Rule 142(a); Rodriquez v. Commissioner, T.C. Memo. 1988-192. Federated argues that it is not liable for such addition because it has substantial authority for its treatment of the items at issue. Sec. 6661(b)(2)(B)(i). The regulations establish that the taxpayer's beliefs regarding the substantiality of the supporting authorities are irrelevant. Sec. 1.6661-3(b)(1), Income Tax Regs. In determining whether substantial authority exists, the relevant types of authorities include the Internal Revenue Code, temporary and final regulations, court cases, and administrative pronouncements. Sec. 1.6661-3(b)(2), Income Tax Regs. Under the regulations, "There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.6661-3(b)(1), Income Tax Regs. The standard for substantial authority is considered more stringent than the reasonable-basis standard used generally regarding additions *420 to tax under section 6653(a) for negligence. Sec. 1.6661-3(a)(2), Income Tax Regs.
Federated has not shown that substantial authority existed for its claim that the Kaminsky debt was worthless in 1983. In its opening and reply briefs, Federated treats substantial authority as if it were a foregone conclusion and fails to cite any authority other than section 166 for its position. That is inadequate; Federated must provide substantial authority for the timing of its deduction, given the facts of the case. It has failed to do so. In the alternative, Federated argues that, notwithstanding the existence of a substantial understatement, respondent should have waived this addition to tax as permitted by section 6661(c). That section, however, gives respondent, not the Court, the discretion to waive the section 6661 addition to tax. Congress made respondent's waiver a discretionary act, and due deference should be given to respondent's exercise of her discretion under that section. Mailman v. Commissioner, 91 T.C. 1079, 1082 (1988). We have held that respondent's denial of a waiver of such addition to tax is subject to review by this Court and that the appropriate *421 standard of review is whether respondent abused her discretion. Id. at 1083. The record here contains no evidence that Federated requested respondent to waive such addition to tax or submitted any materials to respondent showing or implying reasonable cause or good faith on its part as required by section 6661(c). Id. at 1084 n.5. The record also lacks any evidence that respondent had any of her own information on which she might have considered a waiver. Id. at 1084 n.5. We refuse to presume that respondent made any determination concerning whether Federated had reasonable cause for the understatement and acted in good faith. See Magnus v. Commissioner, T.C. Memo. 1990-596. In sum, we cannot find that respondent abused her discretion when Federated never requested respondent to exercise it. See Lapin v. Commissioner, T.C. Memo 1990-343, affd. 956 F.2d 1167 (9th Cir. 1992). Accordingly, we hold that Federated is liable under section 6661 for an addition to tax. B. Herbert Scharer
1. Negligence
In the notice of deficiency sent to Scharer, respondent *422 determined that Scharer was liable for additions to tax for negligence under section 6653(a)(1) and (2). Scharer bears the burden of proving that he is not liable for such additions to tax. Rule 142(a). We, of course, have sustained respondent's determination that Scharer had additional income in the amount of $ 768,000 as a result of Pension Trust distributions. We find here that Scharer has failed to show that he was not negligent in failing to report that income. We thus sustain respondent's additions to tax under section 6653(a)(1) and (2). On brief, Scharer argues only that his tax treatment of the items in question was correct and that, in any event, if it was not, he relied on expert advice in filing his return. Under limited circumstances, a taxpayer may avoid liability for the negligence addition by good faith reliance on expert tax advice. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). Such reliance satisfies the reasonable person standard. See id. Scharer has not shown that he relied on such advice with respect to the Pension Trust payments to Caltan. In fact, the parties have *423 stipulated that many of Federated's attorneys would testify either that they never discussed, or that they do not recollect discussing, with Scharer the tax consequences of those payments. Further, the stipulated testimony of Theodore Anderson, the actuary who prepared Schedules B of the Plan's Form 5500-C and Form 5500-R for the Plan's fiscal years ended March 31, 1983 and 1984, provides that he neither received from Scharer a copy of the Caltan Agreement nor discussed with Scharer the tax consequences of the Pension Trust payments to Caltan. Finally, Scharer has not shown that he informed his accountant, Acker, who prepared Scharer's tax returns, about such Pension Trust payments. Absent a showing that all the necessary information was provided to Acker, Scharer cannot rely on the fact that his return was prepared by Acker. See Moskovitz v. Commissioner, T.C. Memo. 1986-357. 2. Substantial Understatement
In her notice of deficiency sent to Scharer, respondent determined that Scharer also substantially understated his income tax liability and is liable for the addition to tax under section 6661. Scharer bears the burden of proving that he is not liable *424 for that addition. Rule 142(a); Rodriquez v. Commissioner, T.C. Memo. 1988-192. As Federated argued with respect to that addition to tax, Scharer argues (1) that he is not liable for that addition, because he has substantial authority for his tax treatment of the Pension Trust distributions, and (2) that, notwithstanding the existence of a substantial understatement, respondent should have waived this addition to tax under section 6661(c). Sec. 6661(b)(2)(B)(i) and (c). Scharer has cited no authority beyond that cited in support of his argument that there were no pension plan distributions. None of those authorities constitute substantial authority in support of his position. Further, we cannot find that respondent abused her discretion as to a waiver of the addition. Therefore, we conclude that Scharer is liable for the addition to tax under section 6661. Decisions will be entered under Rule 155. APPENDIX
FEDERATED GRAPHICS COMPANIES, INC.
Transactions with Herbert Kaminsky
DATE
DISBURSEMENTS
RECEIPTS
MONTHLY
BALANCE
Check
Check
Check
Number
Amount
Payee
Amount
12/28/81
1392
$9,660   Herbert Kaye
12/29/81
1394
15,000   Herbert Kaye
12/31/81
1403
7,500   Herbert Kaye
12/31/81
$ 24,660   12/31/81
(24,660)  $ 32,160   1/20/82
1039
8,000   Herbert Kaye
1/?/82
1053
5,300   Herbert Kaye
1/29/82
1065
9,900   Herbert Kaye
55,360   2/1/82
1066
10,000   Herbert Scharer
2/1/82
1067
1,300   Herbert Kaye
2/1/82
6,000   2/3/82
16,500   2/5/82
1089
8,000   Herbert Kaye
2/?/82
1090
3,000   Herbert Kaye
2/8/82
1092
8,500   Herbert Kaye
2/8/82
1093
8,500   Herbert Kaye
2/8/82
10,000   2/15/82
1115
8,850   Herbert Kaye
2/15/82
1116
8,850   Herbert Kaye
2/17/82
1118
6,000   Herbert Kaye
2/17/82
1119
6,000   Herbert Kaye
2/19/82
1153
5,500   Herbert Kaye
2/19/82
1154
5,500   Herbert Kaye
2/19/82
20,000   2/20/82
1156
5,500   Herbert Kaye
2/24/82
20,000   68,360   3/3/82
1168
9,000   Herbert Kaye
3/3/82
1169
9,000   Herbert Kaye
3/3/82
1170
9,000   Herbert Kaye
3/9/82
1180
6,500   Herbert Kaye
3/9/82
1181
6,500   Herbert Kaye
3/10/82
1206
4,000   Herbert Kaye
3/12/82
1219
13,000   Herbert Kaye
3/17/82
1223
9,000   Herbert Kaye
3/17/82
1224
6,000   Herbert Scharer
3/22/82
1230
20,000   Herbert Kaye
3/?/82
1241
25,824.31
Herbert Kaye
3/?/82
1242
12,500   Herbert Kaye
198,684.31
4/5/82
$ 12,013.48
4/15/82
10,000   4/23/82
1314
$3,000   Marian Gibson
4/23/82
1315
9,000   Herbert Kaye
4/28/82
1333
25,000   Pierre Hotel
4/28/82
7000   $ 212,970.83
5/4/82
1335
2,700   Herbert Kaye
5/7/82
1350
15,000   Herbert Kaye
5/7/82
15,000   5/13/82
1374
9,000   Morris Goldberg
5/14/82
1380
6,000   Vivian Kouvant
5/14/82
6,000   5/14/82
500   5/18/82
1382
7,000   Morris Goldberg
5/18/82
2,000   5/19/82
1389
2,000   Premiere Showcase
5/19/82
1,000   5/21/82
1,500   5/25/82
2,064.39
5/26/82
600   5/27/82
1,000   5/28/82
500   224,506.44
6/3/82
2,000   6/8/82
3,200   6/10/82
2,000   6/16/82
1,850   6/18/82
1458
7,000   Herbert Kaye
6/21/82
1461
5,000   Herbert Scharer
6/21/82
500   6/22/82
1462
3,800   Marian Gibson
6/23/82
1471
4,200   Herbert Kaye
6/25/82
1478
4,200   Herbert Kaye
6/27/82
2,800   1,500   234,856.44
7/6/82
20,000   7/9/82
1514
8,000   Marian Gibson
7/19/82
1531
23,000   Herbert Kaye
7/19/82
1532
9,000   Herbert Kaye
7/21/82
1533
22,500   Premiere Showcase
7/21/82
1536
3,300   Premiere Showcase
7/27/82
1547
15,000   Premiere Showcase
7/28/82
1552
6,500   Marian Gibson
302,156.44
8/3/82
1559
8,500   Marian Gibson
8/10/82
1589
25,000   Premiere Showcase
8/23/82
1610
30,000   Premiere Showcase
8/25/82
1618
5,000   R.A.C. Jewelers
8/27/82
1621
4,000   Marian Gibson
8/31/82
1628
8,000   Herbert Kaminsky
?/?/82
1629
7,000   Marian Gibson
8/31/82
1631
5,000   Marian Gibson
394,656.44
9/1/82
1633
$3,000   Clarence B. Jones
9/2/82
1635
15,000   Premiere Showcase
9/2/82
1636
5,000   Herbert Kaye
9/9/82
1677
15,000   Herbert Scharer
9/10/82
1681
6,000   Premiere Showcase
9/10/82
1682
4,000   Herbert Kaye
9/14/82
$ 190,000   9/15/82
1696
15,000   Herbert Scharer
9/17/82
1702
1,400   Herbert Scharer
$ 269,056.44
10/29/82
500   268,556.44
11/9/82
218
4,400   Herbert Scharer
11/19/82
243
25,000   Herbert Kaminsky
11/22/82
249
15,000   Herbert Scharer
312,956.44
12/8/82
301
25,000   Herbert Kaminsky
337,956.44
1/4/83
350
9,000   Trans Market
Graphics, Inc.
346,956.44
Subtotal
$ 696,684.31
Loans Made by Trans
Market Graphics to
Kaminksy, Charged to
Account of FGC
$ 53,300
Totals
$ 749,984.31
$ 349,727.87
FINAL NET BALANCE
$ 400,256.44
*425 Footnotes
1. The additions to tax under sec. 6653(a)(1) and (2)↩ for negligence were first determined by respondent in her answer, as an alternative to the additions to tax for fraud.
1. There is a discrepancy between the amount of the Kaminsky loan obtained by Federated from Trans-Market and the amount of such loan shown in the appendix. Because we allow no bad debt deduction, we need not resolve the discrepancy.↩
2. The parties, however, have since stipulated that the statute of limitations does not bar assessment and collection of Federated's income tax liability for the fiscal year ended Mar. 31, 1983.↩
3. At least one transaction with Kaminsky, the first transaction, the gold coins transaction, was booked incorrectly as a loan. Scharer has acknowledged that. The gold coins transaction did not give rise to a loss.↩
4. That is, all of the transactions shown in the appendix, other than the first transaction, which we believe is the gold coin transaction and which we believe Federated concedes was not a loan. In any event, that transaction did not produce a loss.↩
5. Respondent also determined that petitioner Scharer received a taxable distribution from the Plan in the form of an insurance policy on Scharer's life having a cash surrender value of $ 432,983. Respondent; however, has since conceded that Scharer did not receive such a distribution.↩
6. There is conflicting testimony and, as a result, confusion as to when the amendment changing the division of profits from (1) 10 percent of net profit to Tandem and 90 percent to the Stasenko Trust to (2) 10 percent of gross profit to Tandem and 90 percent to the partnership equally was made. Scharer testified that the amendment was made in consideration for the Pension Trust's contributions, while Couri testified that that was done initially, as a necessary inducement to persuade Couri to manage, through Tandem, Caltan's assets. In this case, Couri's version of events seems somewhat more plausible. If we accepted Scharer's version, we would be presented with the difficulty that nowhere on the only copy of the Caltan Agreement in evidence (which does show the division-of-profits modification in question) is the Pension Trust specified as a partner in Caltan. Scharer testified that that was accomplished on another copy of the Caltan Agreement. Scharer's testimony is not inconsistent with the Pension Trust's becoming a partner at a later date, and, if it did become a partner at a later date, it causes us only to conclude that Scharer incorrectly remembered the sequence of events occurring some 8 years earlier.↩
7. Respondent contends that, according to Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), Scharer is prohibited from introducing parol evidence to contradict the face of the Caltan Agreement, which does not show the Pension Trust as a partner. See also Coleman v. Commissioner, 87 T.C. 178, 201-203 and n.17 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). The Eleventh Circuit, the circuit to which the case involving Scharer is appealable, has approved the Danielson rule. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981); Spector v. Commissioner, 641 F.2d 376, 384-386 (5th Cir. 1981), revg. and remanding 71 T.C. 1017 (1979). We have held, however, that neither the Danielson rule nor the strong proof rule, see Coleman v. Commissioner, supra at 201-203, is applicable to exclude parol evidence offered with respect to an ambiguous document. See Elrod v. Commissioner, 87 T.C. 1046, 1065-1066 (1986); Smith v. Commissioner, 82 T.C. 705, 713-716↩ and n.9 (1984). Likewise, Scharer is not prohibited by such rule from testifying as to the interpretation of the terms of the Caltan Agreement, an ambiguous document.
8. The New York statute, N.Y. Penal Law sec. 155.05(2)(a), (d) (McKinney 1988), provides, in part: 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof. 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: (a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses; * * * (d) By false promise.↩
9. In support of that proposition, respondent cites Feinberg v. Commissioner, T.C. Memo. 1979-245, a case dealing with unreported income, in which the taxpayer↩ bore the burden of proof as to the addition for negligence. We fail to see the relevance of that case here, where the issue is not unreported income and respondent bears the burden of proof. 10. Those pages are also referenced in petitioners' proposed finding of fact 58. ↩
11. That testimony is not necessarily contradicted by stipulations that certain attorneys at Todtman, Epstein, Young & Goldstein did not so advise Scharer.↩